**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AVENGING THE ANCESTORS COALITION and THE BLACK JOURNEY: AFRICAN-AMERICAN WALKING TOUR OF PHILADELPHIA,<br><br>Plaintiffs,<br>v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARK SERVICE,<br><br>and<br><br>NATIONAL PARK SERVICE,<br><br>Defendants. | **Civil Action No.** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"*If a race has no history, if it has no worthwhile tradition, it becomes a negligible factor in the thought of the world, and it stands in danger of being exterminated.*"
The Mis-Education of the Negro, Carter G. Woodson

**INTRODUCTION**

1. Austin, Christopher Sheels, Giles, Hercules, Joe (Richardson), Moll, Ona/Oney Judge[1], Paris, and Richmond. These are the names of the nine enslaved African descendants ("Nine

[1] Ona was often referred to as "Oney" by the Washington family; however, Ms. Judge referred to herself as Ona. Oney is used in this Complaint only when cited material refers to her in that manner. *Ona Judge*, George Washington's Mount Vernon,

Enslaved African Descendants") whom George Washington transported from his Mount Vernon plantation to a Colonial-era main house in Philadelphia. There, they would toil in what served as the first executive mansion for a newly formed country.

2. This executive mansion—commonly referred to as the "President's House"—stood at the southeast corner of Sixth and Market (formerly High) Streets. The President's House, noted as America's first "White House," was emblematic of the young nation's hypocrisy.[2]

3. During his lifetime, George Washington, the first President of the United States, was lauded for his many contributions at our nation's founding—including his leadership of the Continental Army during the Revolutionary War and his role in presiding over the Constitutional Convention. His efforts contributed to the creation of a new democratic form of government, premised on the principles of liberty and freedom that were devised to thwart tyranny.

4. Yet, at the same time, Washington faced intense criticism from his contemporaries over his enslavement of 317 people of African descent at Mount Vernon over his lifetime.[3] British essayist Samuel Johnson stated, "How is it we hear the loudest yelps for liberty among the drivers of Negroes?"[4] Edward Rushton, a British abolitionist, penned in a letter to Washington, "Shame!

---

https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/ona-judge (last visited Nov. 18, 2026).

[2] *See, e.g.*, Michael Kilian, *Plans made to mark the 1st 'White House'*, Chi. Trib., Nov. 8, 2003, at 12, also available at https://plus.lexis.com/api/permalink/d26c4c5a-eaf8-4e0e-b41c-64bffd38e9c0/?context=1530671&federationidp=545TXR63404.

[3] *10 Facts About Washington and Slavery*, George Washington's Mount Vernon, https://www.mountvernon.org/george-washington/slavery/ten-facts-about-washington-slavery, (last visited Nov. 18, 2026).

[4] John Garrison Marks, *We've Never Agreed About George Washington and Slavery*, Time (Jan. 23, 2026), https://time.com/7357382/george-washington-slavery-exhibit-philadelphia/.

Shame! That man should be deemed the property of man, or that the name of Washington should be found among such proprietors."[5]

5. Concealed from the public was the fact that Washington also held nine people in slavery at the President's House, which was not widely recognized until more than two centuries later.

6. Not only did the first President enslave people of African descent, but Washington also went to extreme lengths to retain them as his "property." Washington intentionally violated Pennsylvania's Gradual Abolition Act of 1780 and its 1788 amendment—which provided for the freedom of enslaved people after being in the state six months—by rotating the Nine Enslaved African Descendants between his Mount Vernon plantation and the President's House in Philadelphia every six months, thereby preventing their legal emancipation.[6] After May 21, 1796, when Ona Judge made her daring escape from the President's House in search of freedom,[7] Washington "discreetly sent a federal customs officer to bring her back, circumventing procedures laid out in the 1793 fugitive slave law he himself had signed."[8]

7. Historians have long recognized this contradiction within the founding of the United States: leaders of the American Revolution campaigned for liberty and freedom, including

---

[5] *Id.*

[6] Despite being the "first extensive abolition legislation in the western hemisphere," the Act was drafted to gradually emancipate enslaved people without immediately making slavery illegal. *Gradual Abolition Act of 1780*, George Washington's Mount Vernon, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/gradual-abolition-act-of-1780 (last visited Nov. 18, 2026).

[7] *Ona Judge*, *supra* note 1.

[8] Jennifer Schuessler, *In Search of the Slave Who Defied George Washington*, N.Y. Times (Feb. 6, 2017), https://www.nytimes.com/2017/02/06/arts/george-washington-mount-vernon-slavery.html.

freedom from tyranny, while imposing a rapidly expanding system of chattel slavery that relied upon the forced labor of enslaved Black people to build the fledgling nation.[9]

8. This foundational paradox was laid bare in 2001 when historical research revealed that the new site for the Liberty Bell immediately faced what once had been the slave quarters that Washington ordered to be added to the President's House.[10]

9. Although it was widely known that George Washington held enslaved people at his home in Mount Vernon, the new research revealed a little-known fact: Washington also held people in slavery at the President's House in Philadelphia—a city that hosted the first "anti-slavery" protest and was home to a strong abolitionist movement.[11]

10. Upon discovery of these facts, Black Philadelphia residents formed Avenging the Ancestors Coalition ("ATAC"). Recognizing that the stories of Black people are often excluded from the official recounting of American history, ATAC campaigned to ensure that the stories of the Nine Enslaved African Descendants would not be forgotten by commemorating them at the President's House site.

---

[9] *See, e.g.*, Edmund Morgan, *American Slavery, American Freedom: The Ordeal of Colonial Virginia* 6 (1975) (describing "the American paradox, the marriage of slavery and freedom").

[10] *See* Edward Lawler, Jr., *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, 127 Pa. Mag. Hist. & Biogr. 27–29 (2002), https://journals.psu.edu/pmhb/article/view/45510/45231 (providing the conjectural floorplan of the President's House in Philadelphia and describing the servants' hall and the slave quarters added by George Washington in 1790); *President's House Site*, Nat'l Park Serv., https://www.nps.gov/media/photo/gallery-item.htm?pg=3736095&id=69be07a6-155d-451f-6775-9799ea759c84&gid=68C49029-155D-451F-6769F4B1EFBC87A8 (last visited Nov. 18, 2026) (describing how archeologists discovered the foundations of the house during a dig).

[11] Michael D'Onofrio, *Slavery and Philly: Since Arrival of First Enslaved Africans, Deep Scars Exist Here, Across Commonwealth*, WHYY (Aug. 20, 2019), https://whyy.org/articles/slavery-and-philly-since-arrival-of-first-enslaved-africans-deep-scars-exists-here-across-commonwealth/.

11. As a result of ATAC's advocacy, the City of Philadelphia ("City") and the National Park Service ("NPS") were persuaded to recognize the importance of the newly uncovered information about the Nine Enslaved African Descendants in the President's House and the need to tell the unvarnished truth about our nation's history. Thus, the City and NPS worked together, with significant public input, to design a plan for commemorating the nine people who were enslaved at the President's House.

12. Members of ATAC were directly involved in the planning and execution of the memorial and exhibit at the President's House. Shortly thereafter, Michael Coard, ATAC's founder, was selected by then-Mayor John Street to serve on the project's oversight committee, which engaged in a rigorous deliberative process that helped guide the project's design and development, and ensure its ultimate success.

13. On December 15, 2010, the open-air installation and exhibit "President's House: Freedom and Slavery in the Making of a New Nation" ("PH/Slavery Memorial") opened to the public.

14. The PH/Slavery Memorial serves as the first commemoration of enslaved people within the National Park System and is the first slavery memorial of its kind on federal property in American history.[12] For over fifteen years, the site has welcomed thousands of visitors from across the globe.

15. Tours offered by The Black Journey and other tour companies visit the PH/Slavery Memorial daily because they recognize the memorial as vital to explaining the fabric of this nation's history and the struggle for Black freedom.

---

[12] Ben Wofford, *The Memorial Where Slavery is Real*, POLITICO (July 4, 2015), https://www.politico.com/magazine/story/2015/07/america-only-federal-slave-memorial-falling-apart-presidents-house-119731/.

16. On March 27, 2025, President Trump issued Executive Order 14253 ("Executive Order") entitled "Restoring Truth and Sanity to American History."[13] The Executive Order aimed to remedy what it deemed to be a "widespread effort to rewrite [America's] history" by "replacing objective facts with a distorted narrative driven by ideology rather than truth."[14]

17. To purportedly "restor[e] truth and sanity to American history,"[15] Section 4 of the Executive Order directs the Secretary of the Interior to "take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape."[16]

18. On May 20, 2025, Secretary of the Interior, Doug Burgum, issued Secretarial Order No. 3431 ("Secretarial Order"), charging the Director of NPS, Jessica Bowron, to implement the Executive Order by reviewing and removing "inappropriate content."[17]

19. Pursuant to the Secretarial Order, on January 22, 2026, Steven Sims, Superintendent of Independence National Historical Park ("Independence Park"), directed NPS employees, armed with wrenches and crowbars, to dismantle and remove all educational and

---

[13] Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/03/restoring-truth-and-sanity-to-american-history/.

[14] *Id.* at 14563.

[15] *Id.*

[16] *Id.* at 14564.

[17] Restoring Truth and Sanity to American History, Secretarial Order No. 3431 (May 20, 2025), available at https://www.doi.gov/document-library/secretary-order/so-3431-restoring-truth-and-sanity-american-history.

interpretive panels and disable the five motion-activated video screens that were part of the PH/Slavery Memorial.

20. The vast majority of the removed interpretive and educational panels, which had been part of the PH/Slavery Memorial, discussed the "Paradox of Freedom and Slavery" at the founding of the United States. NPS previously identified this paradox as a significance statement to express why Independence Park's "resources and values are important enough to merit designation as a unit of the national park system."[18] The removed panels that compose the "Paradox of Freedom and Slavery" are also "linked to the purpose of [the] park, and . . . supported by data, research, and consensus."[19]

21. For several months, after NPS removed the educational and interpretive panels, the walls of the President's House sat barren.

22. On or about July 15, 2026, in the middle of the night, NPS began installing interpretive panels for a new exhibit at the President's House site. The new exhibit's panels, however, dilute and de-emphasize the "Paradox of Freedom and Slavery." Moreover, the original glass panels that were removed have not been replaced or restored, and the motion-activated videos remain turned off. Most of these panels and videos discuss the lives of the Nine Enslaved African Descendants, the efforts of Ona Judge and Hercules to attain freedom, and the many contributions of Black people at the founding of this nation.

---

[18] U.S. Dep't of the Interior, Nat'l Park Serv., *Foundation Document: Independence National Historical Park Associated National Historic Sites and Memorials* 3, 9 (Sept. 2017), https://www.nps.gov/inde/learn/management/upload/INDE_FD_2017_508-compressed.pdf.

[19] *Id.*




"*Freedom might be too Great a temptation*" – Removed




"*I am free now*" – Removed

23. NPS's actions are part of a coordinated effort by the Trump administration, not only to distort the past and manufacture an alternative narrative of the history of the United States, but also to disparage and denigrate the stories and history of Black people in this country.

24. Plaintiffs ATAC and The Black Journey (collectively, "Plaintiffs") bring this action for injunctive and declaratory relief against Doug Burgum, U.S. Secretary of the Interior; the U.S. Department of the Interior; Jessica Bowron, Director of the National Park Service; and the National

Park Service (collectively "Defendants") for violations of the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act ("APA").

25. Plaintiffs respectfully ask this Court to declare that the Executive Order and the Secretarial Order are unlawful; to vacate the Secretarial Order; to require Defendants to restore the PH/Slavery Memorial to its original condition prior to implementation of the Executive Order and Secretarial Order; and to enjoin Defendants from any further efforts to remove or alter information regarding the Nine Enslaved African Descendants held in bondage at the President's House.

## PARTIES

### PLAINTIFFS

26. **Plaintiff Avenging The Ancestors Coalition ("ATAC")** is a Black-led organization of historians, attorneys, concerned citizens, elected officials, religious leaders, media personalities, community activists, and registered voters. ATAC was founded in 2002 to persuade NPS and Independence Park to create a prominent slavery memorial at the President's House site. ATAC is headquartered in Philadelphia, Pennsylvania.

27. **Plaintiff The Black Journey: African-American Walking Tour of Philadelphia ("The Black Journey")** is a Black, woman-owned walking tour company, founded in 2019, to highlight the frequently overlooked Black history of Philadelphia and the early United States. The Black Journey offers various tours to Philadelphians and visitors from all over the globe. One of the tours that The Black Journey offers is "The Original Black History Tour," which, among other things, allows tourists to "[s]ee where the Fugitive Slave Act was passed in 1793," "[h]ear about Martha Washington's enslaved handmaiden who emancipated herself," and visit the PH/Slavery Memorial.[20] The Black Journey is headquartered in Philadelphia, Pennsylvania.

[20] *The Black Journey: African-American Walking Tour of Philadelphia*, The Black Journey, https://www.blackjourneyphiladelphia.com/ (last visited Nov. 18, 2026).

## DEFENDANTS

28. **Defendant Doug Burgum** is Secretary of the Interior and, as such, he is entrusted by Congress with management of the National Park System, acting through the Director of the National Park Service. *See* 54 U.S.C. § 100101(a).

29. **Defendant Department of the Interior ("DOI")** is a cabinet-level agency that "manages the country's vast public lands, natural resources and cultural heritage," working "collaboratively with states, local communities and federally recognized Indian Tribes, Alaska Natives and the Native Hawaiian Community (hereafter Native Americans) and with U.S. Territories and the Freely Associated States (hereafter Insular Areas)" to do so."[21]

30. **Defendant Jessica Bowron** is the Acting Director of NPS. Under the direction of the Secretary of the Interior, Defendant Bowron handles the supervision, management, and control of the National Park System. *See* 54 U.S.C. § 100302(a)(3).

31. **Defendant National Park Service ("NPS")** is a bureau of the Department of the Interior, that manages the National Park System. The purpose of NPS "is to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* § 100101(a).

## JURISDICTION AND VENUE

32. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the U.S. Constitution.

33. The Court has further remedial authority under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

---

[21] *About Interior*, U.S. Dep't of the Interior, https://www.doi.gov/about (last visited Nov. 18, 2026).

34. Venue is proper under 28 U.S.C. § 1391(b) and (e)(1) because Plaintiffs reside in this district and each defendant is an agency of the United States or an officer of the United States sued in their official capacity.

## RELEVANT STATUTES FOR HISTORICAL AND CULTURAL SITES

28. A detailed statutory and regulatory scheme governs agency changes to sites within the National Park System, which is a collection of "434 individual units covering more than 85 million acres in all 50 states, the District of Columbia, and US territories."[22]

### NATIONAL PARK SERVICE ORGANIC ACT

29. In 1916, Congress passed the National Park Service Organic Act ("Organic Act"), which established NPS as an agency within the Department of the Interior. 54 U.S.C. §§ 100101-320303.

30. Congress charged the Secretary, acting through NPS, with promoting and regulating the use of the National Park System "by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

31. In 1978, Congress supplemented and further clarified the Organic Act to provide that NPS's "authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the

---

[22] *National Park System*, Nat'l Park Serv., https://www.nps.gov/aboutus/national-park-system.htm (last updated Oct. 26, 2026).

System units have been established, except as directly and specifically provided by Congress." *Id.* § 100101(b)(2).

32. Under the Organic Act, NPS may not take any action that would "impair" the resources or values of units within the National Park System. *See* 54 U.S.C. § 100101(a).

33. In addition to the statutory framework, NPS's Management Policies, which interpret the Organic Act, "represent one of the most important tools available" to NPS and, "[t]hrough their judicious and consistent application, . . . set a firm foundation for stewardship that will continue to earn the trust and confidence of the American people."[23]

34. Section 1.4 of the Management Policies sets out NPS's interpretation of the Organic Act and the General Authorities Act of 1970, as amended in 1978, which together supply the agency's most important statutory directive.

35. The Management Policies define an "impairment" as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." *Management Policies* § 1.4.5. Whether an "impact" meets this definition "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." *Id.*

36. An "impact" is likely to constitute an "impairment" to the extent that it affects a resource or value whose conservation is "necessary to fulfill specific purposes identified in the

[23] *Management Policies*, Nat'l Park Serv., https://www.nps.gov/subjects/policy/management-policies.htm (last updated Aug. 6, 2025); *see also* U.S. Dep't of the Interior, Nat'l Park Serv., *Management Policies 2006* § 1.4.5 (2006) [hereinafter *Management Policies*].

establishing legislation or proclamation of the park, or key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or identified in the park's general management plan or other relevant NPS planning documents *as being of significance*." *Id.* § 1.4.5 (emphasis added) (bullets omitted).

37. Park resources and values subject to the non-impairment mandate include, among other things, "cultural landscapes"; "ethnographic resources"; "historic and prehistoric sites, structures, and objects"; and "any additional attributes encompassed by the specific values and purposes for which the park was established." *Id*. § 1.4.6.

38. Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. *Id*. § 1.4.7.

39. In determining whether a proposed action could lead to an impairment, an NPS decision-maker must use their professional judgment. *Id*. NPS Management Policies further outline that an NPS decision-maker must undertake "consultations required under section 106 of the National Historic Preservation Act (NHPA), relevant scientific and scholarly studies"; "advice or insights offered by subject matter experts and others who have relevant knowledge or experience"; and "the results of civic engagement and public involvement activities relating to the decision." *Id*.

40. When an NPS decision-maker becomes aware that an ongoing activity might constitute or lead to an impairment, they must investigate and determine if there is or will be an impairment. *Id*. If the proposed action could lead to or is an impairment of park resources and

values, the action must not be approved or must be eliminated "as soon as reasonably possible." *Id*.

41. NPS also has an obligation to conserve all park resources and values, which is independent of the separate prohibition on impairment, "and applies all the time . . . even when there is no risk that any park resources or values may be impaired." *Id*. § 1.4.3.

42. NPS's Management Policies also state that the purpose of the agency's interpretive and educational programs is to advance NPS's mission "by providing memorable educational and recreational experiences that will (1) help the public understand the meaning and relevance of park resources, and (2) foster development of a sense of stewardship." *Id*. § 7. Because one of the chief functions of national parks is to serve educational purposes, every park is required to develop "an interpretive and educational program that is grounded in (1) park resources, (2) themes related to the park's legislative history and significance, and (3) park and Service-wide mission goals." *Id*. § 7.1.

43. NPS recognizes that interpretive programs "will encourage dialogue and accept that visitors have their own individual points of view[.] Factual information presented will be current, accurate, based on current scholarship and science, and delivered to convey park meanings, with the understanding that audience members will draw their own conclusions." *Id*.

44. NPS's Management Policies recognize that NPS "must change its traditional approach of interpretation to improve relevancy in the 21st century to our visitors." *Id*. § 7.5.1.

45. Additionally, interpretive and educational programs "will be based on current scholarship and research about the history, science, and condition of park resources, and on research about the needs, expectations, and behavior of visitors." *Id*. § 7.5.4. To ensure that this is accomplished, "a dialogue must be established and maintained among interpreters, education

specialists, resource managers, scientists, archeologists, sociologists, ethnographers, historians, and other experts for the purpose of offering the most current and accurate programs to the public." *Id*.

46. In evaluating the effectiveness of NPS's interpretation and education programs, "[v]arious constituencies will be consulted to (1) ensure appropriate content and accuracy, and (2) identify multiple points of view and potentially sensitive issues." *Id*. § 7.5.6.

**CENTENNIAL ACT**

47. In 2016, Congress passed the National Park Service Centennial Act ("Centennial Act"), 54 U.S.C. § 100801 *et seq*., to prepare NPS "for a second century of promoting and protecting the natural, historic, and cultural resources of our National Parks for the enjoyment of present and future generations, and for other purposes." National Park Service Centennial Act, Pub. L. No. 114-289, 130 Stat. 1482 (2016).

48. The Centennial Act charges the Secretary of the Interior with ensuring that management of sites within the National Park System "is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.

49. The Centennial Act defines "interpretation" as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." 54 U.S.C. § 100801(1)(A). "Education" is defined as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." 54 U.S.C. § 100801(2).

50. The Centennial Act authorizes the Secretary of the Interior to "undertake a program of regular evaluation of interpretation and education programs to ensure that they . . . (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the

System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803.

51. The Centennial Act also permits the Secretary of the Interior to "collaborate with other Federal and non-Federal public or private agencies, organizations, or institutions for the purposes of developing, promoting, and making available educational opportunities related to resources of the System and programs." 54 U.S.C. § 100804(3).

## FACTUAL ALLEGATIONS

### THE ENSLAVED AFRICAN DESCENDANTS AT THE PRESIDENT'S HOUSE

52. From 1790 to 1800, when Philadelphia served as the second capital of the United States, a Colonial-era main house, located near the southeast corner of Sixth and Market (formerly High) Streets, served as the executive mansion of the newly founded United States.

53. "The President's House," to which it was commonly referred in formal correspondence, was occupied by the first two American presidents, George Washington and John Adams.

54. Between 1790 and 1797, when George Washington and Martha Washington occupied the property, the Nine Enslaved African Descendants were brought from Mount Vernon to the President's House. As "our first president was guiding the experimental development of the young nation toward modern, republican government,"[24] these nine individuals endured chattel

[24] *President's House in Philadelphia*, Tracing Ctr. (Nov. 29, 2010), https://www.tracingcenter.org/blog/tag/george-washington/.

slavery at the President's House.[25] Washington kept the Nine Enslaved African Descendants in the President's House during his entire stay in Philadelphia.[26]

55. In 1780, Pennsylvania passed the nation's first extensive abolition legislation, which gradually emancipated enslaved people and "prohibited non-residents of Pennsylvania from keeping their enslaved workers in the state longer than six months."[27] Washington exploited a loophole to prevent emancipation by rotating the Nine Enslaved African Descendants brought from Mount Vernon with other indentured servants every six months.

56. The President's House relied upon the forced labor of the Nine Enslaved African Descendants, who included Christopher (a body servant); Moll (a maid); Austin (a stable hand); Hercules (a cook); Hercules's son, Richmond (a scullion); Paris and Giles (stable hands and postillions); Joe Richardson (a coach footman); and Ona (a body servant).[28]

57. Ona, a body servant for Mrs. Washington, escaped from the President's House to freedom in May 1796, settling in New Hampshire.[29] In February 1797, Hercules fled to freedom and settled in New York City.[30]

58. By the 1830s, more than thirty years after Washington's death, most of the President's House had been demolished, and little physical evidence of its existence remained.[31]

---

[25] *President's House Site: Enslaved People in the Washington Household*, Nat'l Park Serv., https://home.nps.gov/inde/learn/historyculture/enslaved-people.htm (last updated Nov. 29, 2023).

[26] Lawler, *supra* note 10, at 27–28 & n.66.

[27] *Gradual Abolition Act of 1780*, *supra* note 6.

[28] Lawler, *supra* note 10, at 27 n.66; *President's House Site: Enslaved People in the Washington Household*, *supra* note 25.

[29] Erica Armstrong Dunbar, *Never Caught: The Washingtons' Relentless Pursuit of Their Runaway Slave Ona Judge* 110–13 (2017).

[30] AECOM, The *Archeology of Freedom and Slavery: Excavations at the President's House Site in Philadelphia* 30 (Nov. 2009, rev. Sept. 2023) (prepared for the Nat'l Park Serv. & City of Phila.), https://npshistory.com/publications/inde/pres-house-excavations.pdf.

[31] *Id.* at i.

Thus, information regarding the Nine Enslaved African Descendants held in bondage at the President's House was lost until almost two centuries later.

## THE ESTABLISHMENT OF INDEPENDENCE NATIONAL HISTORICAL PARK

59. In 1948, Congress enacted Pub. L. 80-795, codified at 16 U.S.C. §§ 407m-407s, to provide for the establishment of Independence Park.

60. Congress established Independence Park for the purpose of preserving, as a national historical park, certain historical structures and properties of national significance located in Philadelphia, Pennsylvania and associated with the American Revolution and the founding and growth of the United States.

61. Since March 1988, Independence Park has been listed in the National Register of Historic Places. (No. 66000683).

62. The President's House (formerly known as the "Executive Mansion") is near the corner of Sixth and Market Streets, in the first block of Independence Park.

63. The President's House is listed as a "Historical Site" within Independence Park that "possess[es] significance for their contributing association with the funding and growth of the United States from 1774 to 1824 and with the lives of persons significant in that period."[32]

## MEMORIALIZATION OF THE NINE AFRICAN DESCENDANTS ENSLAVED AT THE PRESIDENT'S HOUSE

64. In the early 2000s, research revealed that the anticipated new site of the Liberty Bell Center overlapped with the former location of the President's House.

65. In January 2002, the *Pennsylvania Magazine of History and Biography* published an article by historian Edward Lawler, who observed that "[t]he last thing that a visitor will walk

---

[32] U.S. Dep't of the Interior, Nat'l Park Serv., *National Register of Historic Places Inventory—Nomination Form*, sec. 7, at 20-21 (pp.23-24) & sec. 8, at 1 (p.3) (1988), https://npshistory.com/publications/inde/nr-independence-nhp.pdf (last visited Nov. 18, 2026).

across or pass before entering the Liberty Bell Center will be the slave quarters that George Washington added to the President's House."[33] Lawler's research and observation of the tension between the new Liberty Bell Center and the history of slavery at the President's House garnered national attention.

66. Shortly thereafter, historian Gary Nash published an op-ed and gave multiple talks about the Nine Enslaved African Descendants at the President's House to raise public awareness of the site's historical significance. On March 13, 2002, Nash observed in a radio interview that "millions of visitors are going to go into the Liberty Bell not knowing they are walking over the site of Washington's executive mansion, indeed walking over the slave quarters he built at the rear of the house. . . . We have here a conjunction of liberty and slavery on the same site!"[34]

67. In response to the uncovered history of the President's House, Black Philadelphia residents established Plaintiff ATAC for the express purpose of campaigning for the creation of a memorial and exhibit at the site of the President's House to honor the Nine Enslaved African Descendants whom George Washington held in bondage at the site ("Commemorative Project").

68. On March 26, 2002, the Pennsylvania House of Representatives adopted House Resolution No. 490, urging Defendant NPS "to erect a commemorative plaque in recognition of the history of the slave quarters located" at the President's House site and noting the "importan[ce] [of] maintain[ing] a permanent acknowledgement of the rich history of the affected area, especially the history associated with the slave quarters." H.R. Res. 490, 185th Gen. Assemb., Reg. Sess. (Pa. 2002).

[33] Lawler, *supra* note 10, at 93.

[34] *Timeline of the controversy: "The President's House in Philadelphia"*, US History, https://www.ushistory.org/presidentshouse/controversy/index.php (last visited Nov. 18, 2026).

69. Shortly thereafter, ATAC founder Michael Coard delivered a petition—signed by over 1,000 people—to Independence Park, urging Defendant NPS to build the Commemorative Project.

70. In April 2002, NPS Chief Historian Dwight Pitcaithley wrote to Independence Park Superintendent Martha Aikens, urging her to consider including an interpretation of the President's House that juxtaposed the Liberty Bell with the lives of the Nine Enslaved African Descendants whom George Washington held in slavery at the site:

> The contradiction in the founding of the country between freedom and slavery becomes palpable when one actually crosses through a slave quarters site when entering a shrine to a major symbol of the abolition movement. . . . How better to establish the proper historical context for understanding the Liberty Bell than by talking about the institution of slavery? And not the institution as generalized phenomenon, but as lived by George Washington's own slaves. The fact that Washington's slaves Hercules and Oney Judge sought and gained freedom from this very spot gives us interpretive opportunities other historic sites can only long for. This juxtaposition is an interpretive gift that can make the Liberty Bell "experience" much more meaningful to the visiting public. We will have missed a real educational opportunity if we do not act on this possibility.[35]

71. In July 2002, the Appropriations Committee of the U.S. House of Representatives submitted a report to explain the 2003 appropriations bill for Defendant DOI, which included an acknowledgement of the discovery "that George Washington and his household, including eight African American slaves, were quartered at the first Executive Mansion for six and one half years."[36] Given the historical significance of this discovery, the Committee urged Defendant NPS

---

[35] Gary B. Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, 21 Geo. Wright F. 39, 45 (2004) (quoting Letter from Dwight Pitcaithley, Chief Historian, Nat'l Park Serv., to Martha Aikens, Superintendent, Indep. Nat'l Hist. Park (Apr. 2002)), https://www.jstor.org/stable/43597891?seq=1.

[36] H.R. Rep. No. 107-564, at 47 (2002), https://www.congress.gov/committee-report/107th-congress/house-report/564.

"to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."[37]

72. In 2005, Congress authorized $3.6 million for Independence Park's "scenic enhancement and pedestrian walkways improvement project in conjunction with the Park's Executive Mansion Exhibit." Project Authorizations, Publ. L. 109-59, § 1702, 119 Stat. 1144, 1304 (2005).

73. In September 2005, the City and Independence Park convened the President's House oversight committee to help guide the Commemorative Project's development and ensure its ultimate success.

74. The City and Defendant NPS selected a team of community members to join the oversight committee, including Michael Coard and representatives from other groups that had advocated for the Commemorative Project.

75. Shortly thereafter, Defendant NPS, in partnership with the City and Independence Park, distributed a request for qualifications ("RFQ") to announce the Commemorative Project, entitled "The President's House: Freedom and Slavery in the Making of a New Nation," and to invite artists and architects to submit a letter of interest for consideration. In the RFQ, Defendant NPS, the City, and Independence Park communicated that the RFQ "offers an opportunity to tell a story of national importance in an honest, inspiring, and informative way" and that Independence Park considered "this project to be one of the top interpretive opportunities that the National Park Service has to offer."[38]

---

[37] *Id.*
[38] *President's House Design Competition RFQ*, US History, https://www.ushistory.org/presidentshouse/plans/rfq.php (last visited Nov. 18, 2026).

76. In 2006, several semi-finalists were named for the Commemorative Project. Defendant NPS, the City, and Independence Park had a shared understanding that public input was necessary to the development and vision of the exhibit at the President's House. To facilitate this input, the semi-finalists' design models were put on public display at the National Constitution Center and the African American Museum in Philadelphia. The oversight committee reviewed nearly 1,000 evaluation cards from visitors and posted them on the City's website.

77. On February 27, 2007, the City and Independence Park announced the selection of the Commemorative Project's designers. In the announcement, Independence Park Superintendent Dennis Reidenbach stated that, with the commemoration of the Nine Enslaved African Descendants, Independence Park "will be at the forefront of national parks that address the issues of freedom and slavery. [He] could not be more pleased with the opportunity this project offers to teach and remember."[39]

**"PRESIDENT'S HOUSE: FREEDOM AND SLAVERY IN THE MAKING OF A NEW NATION"**

78. On December 15, 2010, the open-air installation and exhibit, "President's House: Freedom and Slavery in the Making of a New Nation," opened to the public.

79. Members of Plaintiff ATAC attended the opening.

80. The PH/Slavery Memorial originally included the structural skeleton of the President's House, made from bricks and other materials; five motion-activated video screens with stories depicting the lives of the Nine Enslaved African Descendants held in bondage by President Washington at the President's House; illustrated educational panels, crafted out of glass and porcelain; metal interpretive panels; a glass vitrine overlooking some remains discovered during

---

[39] Press Release, City of Phila. & Indep. Nat'l Hist. Park, *Finalist Team for President's House Selected* (Feb. 27, 2007), available at https://www.ushistory.org/presidentshouse/news/pr022707.php.

the archeological dig; bronze footprints that symbolize the road to freedom; a wooden and glass memorial space, etched with tribal names and the places of origin of the millions of Africans who were brought to America in bondage; and a granite wall etched with the names of the nine people whom George Washington held in slavery at the site: Austin, Christopher, Giles, Hercules, Joe, Moll, Ona Judge, Paris, and Richmond.[40]


[41]

81. The PH/Slavery Memorial's educational and interpretive panels discussed the "Dirty Business" of slavery and the expansion of chattel slavery in a newly formed nation; shared the original ground plan for the President's House and how household labor was divided among the Nine Enslaved African Descendants, indentured servants, and paid laborers; highlighted the efforts of Ona Judge and Hercules to both resist and escape slavery; and examined the formation of the new American government, its reliance on the labor of enslaved people, and the contentious debate over the location of the nation's capital.

---

[40] *The President's House: Freedom and Slavery in the Making of a New Nation*, Ass'n for Public Art, https://www.associationforpublicart.org/artwork/the-presidents-house-freedom-and-slavery-in-the-making-of-a-new-nation/ (last visited Nov. 18, 2026).

[41] *Visiting the President's House Site*, Nat'l Park Serv., https://www.nps.gov/inde/planyourvisit/presidentshousesite.htm (last updated Feb. 29, 2024).

82. In 2017, Defendant NPS issued the Foundation Document for Independence Park ("Independence Park Foundation Document").[42]

83. Every unit within the National Park System has a foundation document to provide basic guidance for planning and management decisions.[43] Foundation documents are at the core of each unit's planning portfolio.

84. Foundation documents include the following core elements: (a) the "park purpose," which identifies the specific reason or reasons for establishing a particular park; (b) "significance statements," which express why the resources and values of the park are important enough to justify national park designation; (c) "interpretive themes," which connect park resources to relevant ideas, meanings, concepts, contexts, beliefs, and values; (d) "fundamental resources and values," which "are features, systems, organisms, processes, experiences, scenes, sounds, smells, or other attributes determined to warrant primary consideration during planning and management because they are essential to achieving the purpose of the park and maintaining its significance"; and (e) other important resources and values.[44]

85. These components are "core" because they typically do not change over time.[45]

86. The Independence Park Foundation Document recognizes that the core components of Independence Park include more than Independence Hall and the Liberty Bell. The park also preserves and interprets many other important resources associated with the establishment of the government of the United States.[46]

---

[42] *Foundation Document*, *supra* note 18.
[43] *Id.* at 2.
[44] *Id.* at 3.
[45] *Id.*
[46] *Id.* at 5.

87. For the "fundamental resources and values" in the Independence Park Foundation Document, Defendant NPS identified that "[a]rcheological investigations at the President's House Site revealed physical connections to the enslaved in President George Washington's household." Defendant NPS stated that "[t]his information was used to guide future development at the site" and that "[b]ased on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context."[47]

88. The Independence Park Foundation Document also highlights "[t]he site of the President's House, where George Washington and John Adams and their households lived and worked during their terms as the first and second presidents of the United States, prior to Adams' move to the White House in 1800," as central to Independence Park, especially "the paradox of the Washingtons bringing their enslaved people to work and live there."[48]

89. Defendant NPS identified the "Paradox of Freedom and Slavery" as a significance statement in the Independence Park Foundation Document:

> Seeking to win agreement for a new Constitution that would replace the Articles of Confederation, delegates to the Constitutional Convention postponed the discussion about slavery in America by stating that the importation of slaves would cease in 1808. Because this weak clause did not address the issues of slave ownership or the emancipation of individuals held in bondage, the paradox of a nation conceived in liberty but once bound by legalized slavery can be explored at Independence National Historical Park.[49]

90. In 2022, the PH/Slavery Memorial was designated as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act.[50]

---

[47] *Id*. at 11.
[48] *Id*. at 5.
[49] *Id*. at 9.
[50] National Underground Railroad Network to Freedom Act of 1998, Pub. L. No. 105-203, 112 Stat. 678 (codified at 54 U.S.C. §§ 308301–308304); *see also Underground Railroad:*

91. Following the passage of the National Underground Railroad Network to Freedom Act of 1998, the Network to Freedom program was created to "honor, preserve, and promote the history of resistance to slavery through escape and flight."

92. The application for recognition of the PH/Slavery Memorial under the National Underground Railroad Network to Freedom Act details the importance of the site as the location where, in 1796, Ona Judge escaped from slavery and where President Washington signed the Fugitive Slave Act of 1793 into law. Under the Fugitive Slave Act, Ona Judge was considered a fugitive from justice, subject to recapture until her death.[51]

93. In 2022, Cynthia MacLeod, then Superintendent of Independence Park, signed the application for recognition of the PH/Slavery Memorial under the National Underground Railroad Network Act.

## DEFENDANTS' ACTIONS AFFECTING CULTURAL AND HISTORICAL SITES

### A. President Trump's Executive Order 14253

94. On March 27, 2025, President Trump issued Executive Order 14253, entitled "Restoring Truth and Sanity to American History."[52] The Executive Order aimed to remedy what

---

*Explore Network to Freedom Listings*, Nat'l Park Serv., https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm (listing all Network sites, including President's House as "Ona Judge Escape Site (Independence National Historical Park)") (last visited Nov. 18, 2026). The purpose of the Act is "[t]o authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation." Pub. L. No. 105-203, § 2(b)(2), 112 Stat. 678, 679.

[51] *See* Fugitive Slave Act of 1793, Sess. II. Ch. 7 1793, § 1, 1 Stat. 302, 302 (repealed 1864).

[52] Executive Order on Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. 14563.

it characterized as a "widespread effort to rewrite [America's] history," which purportedly "replac[ed] objective facts with a distorted narrative driven by ideology rather than truth."[53]

95. The Executive Order warns of a so-called "revisionist movement" that casts the United States in a "negative light" by portraying the country as "inherently racist, sexist, oppressive, or otherwise irredeemably flawed."[54] According to the Executive Order, this effort to "rewrite history . . . disregard[s] the progress America has made and the ideals that continue to inspire millions around the globe."[55]

96. The Executive Order fixates on race and the consideration of its role in the history, culture, and identity of the United States. The Executive Order labels "interrogating institutional racism" and the idea that "America is purportedly racist" as "corrosive ideology" that was advanced by the prior administration.[56]

97. To purportedly "restor[e] truth and sanity to American history,"[57] Section 4 of the Executive Order directs Defendant Burgum to: (a) determine whether certain public monuments, memorials, statues, markers, or similar properties "have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology"; and (b) "take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties . . . do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape."[58]

98. Section 3 of the Executive Order specifically addresses "Restoring Independence Hall," stating that Defendant Burgum "shall provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park, which shall be complete by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence."[59] Under the General Provisions, the Executive Order states that it "shall be implemented consistent with applicable law."[60]

**B. Defendant Burgum's Secretarial Order No. 3431**

99. On May 20, 2025, Defendant Burgum issued Secretarial Order No. 3431, which states that its purpose is to implement provisions of the Executive Order.[61]

100. The Secretarial Order identifies the Organic Act as one of the Secretarial Order's "authorities," but does not explain how the Secretarial Order complies with, or effectuates, the mandates of the Organic Act.[62]

101. In the Secretarial Order, Defendant Burgum directly quotes language from the Executive Order, reiterating that it is the administration's policy to "restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing."[63]

---

[58] *Id.* at 14564.
[59] *Id.*
[60] *Id.* at 14565.
[61] Restoring Truth and Sanity to American History, Secretarial Order No. 3431 § 1.
[62] *Id.*
[63] *Id.*

102. In the Secretarial Order, Defendant Burgum reiterates the Executive Order's instructions by stating that the "natural and historical resources" managed by Defendant DOI "should accurately reflect American history and not partisan ideology."[64]

103. The Secretarial Order further requires Defendant DOI to "take action, as appropriate and consistent with applicable law" to ensure that properties and other sites within its jurisdiction "do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times) and instead focus on the greatness of the achievements and progress of the American people."[65]

104. Section 4 of the Secretarial Order directs Defendant Bowron to "identify any infrastructure improvements, including deferred maintenance and restoration activities, necessary to improve the infrastructure of Independence National Historical Park, including Independence Hall; identify funding needed to complete any such projects or activities; and subject to available funding and consistent with applicable law and authorities, enter into any contracts or other agreements necessary to complete the projects or activities in such time as to allow for sufficient preparation for the celebration of the 250th anniversary of our Nation's birth on July 4, 2026."[66]

105. In Section 5 of the Secretarial Order, Defendant Burgum directs Defendant Bowron to implement Section 4 "[c]onsistent with [the Executive Order] and governing laws and regulations."[67]

106. Defendant Burgum charges Defendant Bowron with conducting a review of changed or removed properties and, within sixty days, "concluding whether the alteration or

---

[64] *Id*. at 2.
[65] *Id*.
[66] *Id*. at 2–3.
[67] *Id*. at 3.

removal of each property was made to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology."[68]

107. The Secretarial Order also directs Defendant Bowron to review properties to identify what the administration deems to be inappropriate content:

> Within 90 days of the date of this Order, each land management Bureau shall conduct a review of all public monuments, memorials, statues, markers, or similar properties on lands within its jurisdiction to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.[69]

108. As part of the review of properties for inappropriate content, the Secretarial Order requires Defendant Bowron to remove:

> [A]ny content meeting the criteria identified in paragraph 1 or otherwise found to be inconsistent with the purposes of EO 14253. The relevant land management Bureau shall then take action to replace the removed content with content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with EO 14253. In developing appropriate content, the land management Bureau shall coordinate with the Office of Communications within the Office of the Secretary.[70]

109. Section 6 of the Secretarial Order directs Defendant Bowron to post signage throughout each property to allow for public input via QR code "as to the state of the property, its management, and its compliance with this Order."[71] The Secretarial Order prescribes the specific language to be included in the request for feedback—requesting that parkgoers flag, among other things, "any signs or other information that are negative about either past or living Americans or

[68] *Id.*
[69] *Id.* at 4.
[70] *Id.*
[71] *Id.*

that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features."[72]

### C. Other Statements and Actions by President Trump and His Administration

110. The Executive Order, Secretarial Order, and actions taken by Defendants at the PH/Slavery Memorial were part of a long pattern of President Trump and/or his administration attacking and suppressing educational and cultural materials concerning race and/or Black people.

111. Launched in 2019, the 1619 Project is long-form journalism from *The New York Times* that seeks to tell stories of the nation's founding through the lens of the arrival of the first enslaved Africans on the shores of Virginia.

112. The 1776 Advisory Commission report, produced on January 18, 2021, pursuant to President Trump's Executive Order 13958, states that approaches to teaching American history like the 1619 Project are "distorted."[73] Core to the work of the 1776 Commission was an explicit effort to "rebut[] … attempts" to "reframe American history around the idea that the United States is not an exceptional country but an evil one," which was aimed at decentering the history of slavery in the telling of America's story.[74] During President Trump's first term, he referred to the 1619 Project and similar educational studies as a "crusade against American history," "toxic propaganda," and "ideological poison."[75]

---

[72] *Id*. at 4–5.

[73] The President's Advisory 1776 Commission, *The 1776 Report*, The White House, 36 (2021) https://perma.cc/MG3S-5L8Q (captured Dec. 17, 2023).

[74] *1776 Commission Takes Historic and Scholarly Step to Restore Understanding of the Greatness of the American Founding*, White House (Jan. 18, 2021), https://perma.cc/8JNX-PQDA (captured Oct. 18, 2021).

[75] Donald J. Trump, *Remarks by President Trump at the White House Conference on American History*, White House (Sept. 17, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/.

113. President Trump further stated that the 1619 Project "rewrites American history to teach our children that we were founded on the principle of oppression, not freedom." In the same speech, President Trump stated that individuals who support the 1619 Project view everything through the lens of race and seek to "impose a new segregation," and he would "not allow that to happen."[76]

114. In January 2025, President Trump issued Executive Order 14185, titled "Restoring America's Fighting Force," which prohibited the Department of Defense and the Armed Forces from using educational materials that describe America's "founding documents [as] racist or sexist."[77]

115. In August 2025, President Trump accused the Smithsonian Institution of focusing too much on "how bad Slavery was"[78] and not enough on "Brightness" and the "Future."[79]

116. In a social media post, President Trump wrote, "This Country cannot be WOKE, because WOKE IS BROKE. We have the 'HOTTEST' Country in the World, and we want people to talk about it, including in our Museums."[80]

---

[76] *Id.*

[77] Restoring America's Fighting Force, Exec. Order No. 14185, 90 Fed. Reg. 8763 (Jan. 27, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/restoring-americas-fighting-force/.

[78] Zolan Kanno-Youngs, *Trump Says Smithsonian Focuses Too Much on 'How Bad Slavery Was*,' N.Y. Times (Aug. 19, 2025); https://www.nytimes.com/2025/08/19/us/politics/trump-smithsonian-slavery.html; Raquel Uribe, *Trump says the Smithsonian focuses too much on 'how bad slavery was'*, NBC News (Aug. 19, 2025), https://www.nbcnews.com/politics/donald-trump/trump-smithsonian-how-bad-slavery-was-review-museums-rcna225964.

[79] Kanno-Youngs, *supra* note 78.

[80] *Id.*

117. Several months later, in October 2025, President Trump stated that he would be amenable to erecting a statue honoring Robert E. Lee, who was a secessionist, commander of the Confederate Army, and a supporter of slavery.[81]

118. On July 4, 2026, the Domestic Policy Council of the White House released a 162-page report, pursuant to the Executive Order, titled "Saving America's Story: How Ideological Capture at the Smithsonian Institution's National Museum of American History Erases Our Heritage."[82]

119. The report states that "[i]n the Museum's current telling, the country is, above all, defined by white supremacy, slavery, conquest, exclusion, hierarchy, racism, xenophobia, misogyny, and systemic injustice."[83]

120. The report asserted that the National Museum of American History purportedly slanders America's founding fathers by "highlighting that some Founders, like Alexander Hamilton and Benjamin Franklin, owned slaves while downplaying or completely excluding information about their abolitionist efforts (or their pivotal roles in American history) . . . ."[84]

121. It further claims that, "The report identifies a broad pattern: the Founders are minimized, if not entirely excluded; traditional patriotic narratives are treated with suspicion, if not outright contempt; and the basic symbols and stories that once helped unify Americans are

---

[81] Andrew Feinberg, *Trump 'OK' with DC statue honoring Civil War leader who fought for slavery: 'Lot of people in this room' agree*, Independent (Oct. 16, 2025), https://www.independent.co.uk/news/world/americas/us-politics/trump-ballroom-dinner-robert-e-lee-statue-b2846627.html.

[82] Dom. Policy Council, *Saving America's Story*, White House (2026), https://www.whitehouse.gov/wp-content/uploads/2026/07/Smithsonian-Report-Saving-Americas-Story.pdf.

[83] *Id*. at 2.

[84] *Id*. at 12, 102.

presented not as reasons for gratitude and inspiration, but as objects to be inherently questioned, dismantled, 'problematized,' and reinterpreted to achieve ideological ends."[85]

122. On July 24, 2026, President Trump issued Executive Order 14416 "Restoring Trust in the Smithsonian Institution." Sections 2 and 3 of Executive Order 14416 direct Defendant Burgum, acting through Defendant Bowron and in coordination with the Assistant to the President for Domestic Policy, to install temporary signage or exhibits regarding the findings of the report and correct "inaccurate information" presented inside the National Museum of American History.[86]

123. Statements made by President Trump and administration officials that are contemporaneous with the Executive Order and Secretarial Order, as well as subsequent statements, confirm the Executive Order's focus on race and its targeting of slavery, the civil rights movement, and other historical events and discussions pertaining to Black people that are disfavored by the Trump administration.

**DEFENDANTS' DISMANTLING OF THE PH/SLAVERY MEMORIAL AND INSTALLATION OF A NEW EXHIBIT AT THE PRESIDENT'S HOUSE**

124. Public concern about the PH/Slavery Memorial grew as employees of Defendant NPS, acting in accordance with the Secretarial Order, began flagging sites with references to slavery for removal, which was originally scheduled to take place by September 17, 2025.[87]

---

[85] *Id*. at 2.

[86] Restoring Trust in the Smithsonian Institution, Exec. Order No. 14416, 91 Fed. Reg. 47925 (July 29, 2026), available at https://www.whitehouse.gov/presidential-actions/2026/07/restoring-trust-in-the-smithsonian-institution-e061/.

[87] *See* TaRhonda Thomas, *Fears for Independence Mall as Trump orders removal of displays that 'disparage' American history*, 6ABC (Sept. 17, 2025), https://6abc.com/post/fears-independence-mall-trump-orders-removal-displays-disparage-american-history/17829883/.

125. Removal did not occur until January 22, 2026, when Defendant NPS, suddenly and without warning to the public, dismantled and removed all educational and interpretive panels and disabled the five motion-activated video screens that are part of the PH/Slavery Memorial.[88]

126. Shortly thereafter, the City filed a complaint and moved to preliminarily enjoin Defendants from dismantling and removing the PH/Slavery Memorial. *See* Compl., *City of Philadelphia v. Burgum,* No. 2:26-cv-00434 (E.D. Pa. Jan. 22, 2026), ECF No. 1; Pl.'s Mot. for Prelim. Inj., *City of Philadelphia v. Burgum*, ECF No. 2.

127. On January 28, 2026, Defendants filed an Affidavit from the NPS Superintendent of Independence Park, Steven Sims, in *City of Philadelphia v. Burgum*. Sims Decl., *City of Philadelphia v. Burgum*, ECF No. 27-1.

128. Steven Sims' role, as NPS Superintendent of Independence Park, "is to implement the mission of the National Park Service to 'preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations,'" echoing the language of the Organic Act and its non-impairment mandate. *Id*. at 2.

129. On January 22, 2026, Superintendent Sims received direction from Defendant Bowron "to remove the video and exhibits on the interior and exterior of the walls of the President's House," while keeping the "footprints in the concrete and the names on the Memorial Wall . . . as-is." *Id.*

130. Accordingly, Superintendent Sims directed employees of Defendant NPS to remove "all but one of the exhibits on the interior and exterior of the President's House walls using

---

[88] Ashley Ahn, *National Park Service Dismantles Slavery Exhibit in Philadelphia*, N.Y. Times (Jan. 22, 2026), https://www.nytimes.com/2026/01/22/us/politics/park-service-philadelphia-slavery-exhibit.html.

hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls." *Id*.

131. The seventeen metal interpretive panels, which Defendant NPS removed from the PH/Slavery Memorial, were designed through consultation with historians to capture the five themes identified under the cooperative agreement between the City and Defendant NPS. The panels include information about the history of the trans-Atlantic slave trade, the roughly 12.5 million Africans brought to the Americas through the system of chattel slavery, the growth of slavery in Philadelphia, and the resistance to slavery through the abolitionist movement. Another removed panel discussed the Fugitive Slave Acts and the Three-Fifths Compromise.

132. The removed metal interpretive panels make up the majority of the interpretive and educational material available at the PH/Slavery Memorial.

133. In addition to the removal of the educational and interpretive panels, employees of Defendant NPS disabled five motion-activated video screens, which depicted the lives of the Nine Enslaved African Descendants held in bondage at the President's House. *See* Sims Decl. at 2, *City of Philadelphia v. Burgum*, ECF No. 27-1, at 2.



[89]

[89] Nick Kariuki, *'It's a Damn Shame': Park Service Crews Dismantle President's House*

134. Defendant NPS stored the removed panels and materials in the basement of the National Constitution Center in Philadelphia. *Id.*

135. On information and belief, Defendants did not make a reasoned determination as to whether their actions constituted an "impairment" that would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. *See generally Management Policies* § 1.4.5.

136. On information and belief, the removal of the educational and interpretive panels and the disabling of the motion-activated video screens are part of an orchestrated effort by Defendants to censor, erase, destroy, and rewrite certain aspects of American history, especially with respect to Black people in the United States. As part of this effort, Defendants are targeting historical and cultural sites that include information about Black people in the United States, slavery, and the civil rights movement for censorship, erasure, destruction, and inaccurate revision.

137. An inspection report of the removed exhibit materials noted that the displays are not destroyed but that certain panels show damage. Inspection Rep. at 1, *City of Philadelphia v. Burgum*, ECF No. 39, at 1.

138. Members of Plaintiff ATAC, as well as a tour guide with Plaintiff The Black Journey, were present during the inspection of the exhibit materials stored in the National Constitution Center's basement, which took place on February 2, 2026.

139. On February 16, 2026, the district court, in *City of Philadelphia v. Burgum*, ordered the restoration of the PH/Slavery Memorial to its status as of January 21, 2026, the day prior to the removal. Prelim. Inj. Order, *City of Phila. v. Burgum*, ECF No. 54.

---

*Exhibit on Slavery*, Billy Penn (Jan. 22, 2026), https://billypenn.com/2026/01/22/presidents-house-exhibit-slavery-dismantled/ (depicting the educational and interpretive panels that Defendants removed from the PH/Slavery Memorial).

140. Defendant NPS reinstalled sixteen of the seventeen glass educational panels and reactivated four of the functioning motion-activated video screens on February 19, 2026.

141. None of the metal interpretive panels that provide additional and necessary context for the PH/Slavery Memorial and that were created in consultation with Defendant NPS historians were reinstalled.

142. During argument on the preliminary injunction in *City of Philadelphia v. Burgum*, Defendants asserted that there is no administrative record concerning Defendant NPS's actions at the President's House site during the current administration, including the removal of exhibit materials that are part of the PH/Slavery Memorial. Hearing Tr. at 130, ECF No. 45-1 ("[T]here is no administrative record.").

143. On April 7, 2026, Defendant NPS published, on the NPS website, digital renderings of interpretive panels for a new exhibit at the President's House site.[90]

144. During argument before the United States Court of Appeals for the Third Circuit ("Third Circuit"), Defendant NPS discussed plans to install the new exhibit's interpretive panels at the President's House site, should the district court's injunction in *City of Philadelphia v. Burgum* be dissolved.[91]

145. On June 18, 2026, the Third Circuit vacated the preliminary injunction that barred Defendant NPS from installing the new exhibit's interpretive panels.[92]

---

[90] *Visiting the President's House: From Enslavement to Emancipation,* Nat'l Park Serv., https://www.nps.gov/inde/planyourvisit/presidentshousesite.htm (last visited Nov. 18, 2026).

[91] *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, 179 F.4th 169, 184 (3d Cir. 2026) ("At argument, NPS noted, for the first time, that it had designed replacement panels and stood ready to install them should the injunction dissolve.").

[92] *Id.* at 186.

146. On or around July 15, 2026, Defendant NPS installed portions of the new exhibit's interpretive panels at the President's House site.

147. The new exhibit is entitled "Visiting the President's House Site: From Enslavement to Emancipation," in place of the PH/Slavery Memorial's original exhibit title: "The President's House Site: Freedom and Slavery in the Making of a New Nation."

148. The title misrepresents the lives of the Nine Enslaved African Descendants. Although all of them experienced slavery, none experienced emancipation. Ona Judge and Hercules achieved freedom only by escaping from President Washington's household.

149. Defendant NPS quickly drew public criticism for the omission of the stories of the Nine Enslaved African Descendants who were previously highlighted in the PH/Slavery Memorial's original exhibit.[93]

150. On September 30, 2026, Defendant NPS installed several additional interpretive panels that have yet to be included on the NPS website for the President's House site.

151. Although the new exhibit's interpretive panels do not omit all references to the institution of chattel slavery in the United States, the vast majority of the information removed or altered by Defendants includes descriptions of the harms of slavery, the hardships experienced by the Nine Enslaved African Descendants who were held in bondage at the President's House, and free or enslaved African descendants who were foundational to the development of the United States.

152. For example, the new exhibit's "Welcome" panel, which serves as an introduction to the President's House site, only contains images of George Washington and John Adams–

[93] TaRhonda Thomas, *Federal government installs reworked panels about slavery at George Washington's Philadelphia home*, 6ABC (July 16, 2026), https://6abc.com/post/slavery-panels-replaced-presidents-house-site-philadelphia/19513565/.

omitting the image of Ona Judge that the original welcome panel included, and references only "household staff" rather than mentioning enslavement or the Nine Enslaved African Descendants at all.

153. While the interpretive panels for the PH/Slavery Memorial centered "the paradox of a nation conceived in liberty but once bound by legalized slavery,"[94] the new exhibit's set of interpretive panels frames the Executive Branch as central to the exhibit's theme and the President's House site, with twelve interpretive panels detailing the history, duties, inner workings, and past members of the Executive Branch.

154. Defendant NPS had identified that archeological investigations at the President's House site revealed physical connections to enslaved members of Washington's household in the "fundamental resources and values" in the Independence Park Foundation Document. However, the new exhibit panel, entitled "History Lost & Found: Discoveries," mentions that an archeological dig uncovered a "basement passageway" and—unlike the PH/Slavery Memorial interpretive panels—fails to explain that the "kitchen basement and underground passage" were "spaces enslaved Africans and free and indentured servants carried out many of their domestic chores out of sight of the Washington family, guests, and official visitors of the house."

155. Defendant NPS states, in the Independence Park Foundation Document, that "the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context." The new exhibit, however, de-emphasizes the role of slavery at the nation's founding through Defendant NPS's purge of the following discussions that were contained in the PH/Slavery Memorial's interpretive panels:

---

[94] *Foundation Document*, *supra* note 18, at 9.

a. Panel entitled "The Dirty Business of Slavery," capturing topics such as the "Constitutional Compromise," whereby the framers of the U.S. Constitution did not include prohibitions against slavery in order "[t]o appease slaveholders," despite the document being founded upon ideals of liberty. The panel also noted that northern delegates compromised on the issue of congressional representation by allowing each enslaved person to be counted as three-fifths of a "person" for population purposes.

b. Panel entitled ". . . is hereby empowered to seize such fugitives," which expounded on the fact that enslaved African descendants, due to the color of their skin, could not live without fear of kidnappers operating under the license provided by the Fugitive Slave Act of 1793, which provided individuals a "virtual man-hunter's license."

c. Panel entitled, "Life Under Slavery," which discussed the brutality that enslaved people suffered at the hands of slaveholders because of feared rebellion.

d. Panel entitled, "Contagion and Liberty: The Yellow Fever Epidemic and the Revolution in Saint Domingue," which discussed the emigration to Philadelphia of slave owners escaping the slave rebellion in Haiti. The panel discusses how those slaveholders brought enslaved people to Philadelphia, as well as the yellow fever disease, and "the suspicion that slavery might yield 'dreadful instructions.'"

156. Rather than focusing on "the paradox of the Washingtons bringing their enslaved people to work and live [at the President's House]," which Defendants NPS previously identified as central to Independence Park, the new exhibit includes fewer interpretive panels that focus on the Nine Enslaved African Descendants held in bondage at the President's House.

157. For example, Defendant NPS removed a panel entitled “Oney Escapes!”, which discussed the story of Ona Judge’s escape to freedom from enslavement in the President’s House after she “overheard Martha Washington state her intention of giving the young woman to her granddaughter.”

158. Defendant NPS also removed a panel entitled “Chef Hercules,” which discussed Hercules, President Washington’s cook and one of the Nine Enslaved African Descendants forced to work at the President’s House. This panel included a quote from President Washington, revealing his intent to keep the people he held in slavery from learning about the Gradual Abolition Act: “The idea of freedom might be too great a temptation for them to resist. At any rate, it might, if they convinced, they had the right to it, make them insolent in a State of Slavery.”

159. Due to Defendant NPS’s removal of video monitors throughout the exhibit, the exhibit omits references to the physical and sexual violence faced by the Nine Enslaved African Descendants.

160. Although the new exhibit’s interpretive panels reference slavery, the discussions sanitize the institution’s harms by, for example, removing an earlier reference to President Washington’s intentional rotation of the Nine Enslaved African Descendants “to prevent them from gaining freedom under Pennsylvania law,” which further omits fundamental interpretive context for the PH/Slavery Memorial. The current panel “Presidents Washington and Adams on Slavery,” instead describes President Washington’s decision to rotate the Nine Enslaved African Descendants he held in slavery in and out of Philadelphia as an “acknowledgement” of the Gradual Abolition Act.

161. Throughout the current exhibit, the discussion of President Washington as a slave owner is sanitized. The exhibit prefaces the biographies of the Nine Enslaved African Descendants

in the current panel, "Enslaved People at the President's House," with the following description of how President Washington treated them in the household: "[They were] integral parts of the complex life in the household. . . . President Washington knew and trusted his enslaved house staff enough to buy them tickets for the circus and theater and to let them venture out into the city's markets on their own." This point, which is raised in two separate panels at the current exhibit, diminishes the harms of enslavement.

162. The new exhibit's interpretive panels also include fewer images of enslaved, formerly enslaved, or free people of African descent. Where the PH/Slavery Memorial's interpretive panels included sixteen depictions of enslaved, formerly enslaved, or free people of African descent, there are now only four depictions of enslaved, formerly enslaved, or free people of African descent—two of whom are of the same person, Ona Judge.

163. Finally, Defendant NPS removed the interpretive panel, "Washington's Death and a Renewed Hope for Freedom." This panel expounded upon President John Adams' call for a day of mourning to mark President Washington's death in 1799, and how Reverend Richard Allen saw an opportunity for the free African Community of Philadelphia to expand the meaning of freedom. While Reverend Allen is discussed in the "Alt text for Exhibit Panel" section for "Slavery in the British Colonies," on NPS's website,[95] the panel that is now in place erases the specificity of this history, and the information does not appear at the physical site.

## DEFENDANTS' PLAN TO ERASE, CENSOR, AND INACCURATELY REVISE AMERICAN HISTORY PERTAINING TO BLACK PEOPLE.

164. Since President Trump issued the Executive Order, Defendants have left undisturbed countless public monuments, memorials, statues, markers, or similar displays within

[95] *Visiting the President's House: From Enslavement to Emancipation*, Nat'l Park Serv., https://www.nps.gov/inde/planyourvisit/presidentshousesite.htm (last visited Nov. 18, 2026).

the National Park System that discuss the contributions of white people in the United States and have not suggested that they "inappropriately disparage Americans past or living" or fail to "focus on the greatness of the achievements and progress of the American people[.]"[96]

165. At the same time, Defendant NPS has unilaterally targeted cultural resources and interpretive materials that illuminate the hardships, achievements, contributions, and progress of Black people in the United States—including enslaved African descendants and celebrated Black historical figures—as "corrosive" to American identity and has already removed or plans to remove them from public view without reasoned explanations based on credible facts and research.

166. Following the issuance of the Executive Order and the Secretarial Order, Defendant NPS's personnel grappled with "how to tell stories about enslavement or the oppression of Native Americans without implicating the white Americans of those eras[.]"[97] Defendant NPS flagged for removal materials in bookstores and gift shops that "address[] slavery, … civil rights icons like Malcolm X and the Freedom Riders, and descriptions of the methods used to control enslaved people."[98]

167. In March 2025, Defendant NPS took down its webpage dedicated to the life and work of Black civil rights activist Pauli Murray, which had highlighted their prolific writings at the intersection of race and gender, as well as the discrimination they faced in education and

---

[96] Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. at 14564.

[97] Heather Richards, *Burgum asked park rangers to flag negative US history. They're delivering.*, POLITICO PRO (June 15, 2025), https://subscriber.politicopro.com/article/eenews/2025/07/15/burgum-asked-park-rangers-to-flag-negative-us-history-theyre-delivering-00453403.

[98] Letter from Rep. Jared Huffman et al., to Doug Burgum, Sec'y of the Interior, U.S. Dep't of the Interior 2 (Aug. 6, 2025), https://democrats-naturalresources.house.gov/imo/media/doc/FINAL_Opposition%20to%20Censorship%20at%20National%20Park%20Sites.pdf.

employment during the civil rights movement-era.[99] The webpage had included information on Murray's influence on Supreme Court Justice Thurgood Marshall and Supreme Court Justice Ruth Bader Ginsburg in their advocacy to protect the civil rights of Black people and other groups experiencing marginalization and discrimination.[100]

168. In or around March 2025, Defendant NPS removed from its webpage about the Underground Railroad a large image of Harriet Tubman, along with a quote in which she recounted her experience operating and facilitating the Underground Railroad for enslaved people seeking freedom.[101]

169. The new page replacing Harriet Tubman's image and quote omits several references to slavery—as well as references to the Fugitive Slave Act of 1850,[102] a law requiring slave patrols to arrest Black people suspected of escaping slavery and guaranteeing federal assistance to enslavers who recovered the enslaved people who had escaped.[103] The updated webpage makes no reference to Harriet Tubman besides a small commemorative stamp.[104]

170. In September 2025, right before the expiration of the 120-day period during which the Secretarial Order mandated removal of any content conflicting with the Executive Order,

[99] Neda Ulaby, *NPS takes down web pages dedicated to transgender activists and LGBTQ history*, NPR (Mar. 5, 2025), https://www.npr.org/2025/03/05/nx-s1-5318767/nps-lgbtq-transgender-history.

[100] Storey Wertheimer, *Pauli Murray bio is scrubbed from federal site, to locals' dismay*, 9th Street Journal (Mar. 6, 2026), https://9thstreetjournal.org/2025/03/06/pauli-murray-bio-is-scrubbed-from-federal-site-to-locals-dismay/.

[101] Zoe Sottile, *National Park Service removes references to Harriet Tubman from Underground Railroad webpage*, CNN (Apr. 7, 2025), https://www.cnn.com/2025/04/06/us/national-parks-underground-railroad-harriet-tubman.

[102] *Id.*

[103] *See The Fugitive Slave Act (1850)*, Nat'l Const. Ctr., https://constitutioncenter.org/the-constitution/historic-document-library/detail/the-fugitive-slave-act-1850 (last visited Nov. 18, 2026).

[104] Sottile, *supra* note 101.

federal officials at Fort Pulaski National Monument in Georgia ordered the removal of the "Scourged Back" image at national museums and historical sites.[105]

171. "Scourged Back" is an internationally recognized portrait of a formerly enslaved man from Louisiana, seated with his bare back to the camera, showing crisscross scars and welts from whippings by enslavers.[106] The image was widely disseminated during the American Civil War and became an influential photograph of the nineteenth century in support of abolition.[107]

172. Defendants removed "Scourged Back" pursuant to the Executive Order.[108]

173. In January 2026, Defendant NPS removed brochures from the Medgar & Myrlie Evers Home National Monument, partly because Evers' murderer, a white man, was described as "racist."[109]

174. Defendant NPS made further modifications, including removal of information about Medgar Evers lying in a pool of blood after being shot by a white supremacist and the connection between his assassination and his outspoken stance on civil rights for Black people.[110]

175. The brochures, which Defendant NPS pulled from the site, accurately stated that Evers' murderer, Byron De La Beckwith, was "a member of the racist and segregationist White

---

[105] Jake Spring & Hannah Natanson, *National Park to remove photos of enslaved man's scars*, Wash. Post (Sept. 15, 2025), https://www.washingtonpost.com/climate-environment/2025/09/15/national-parks-slavery-information-removal/; Oscar Holland, *'Scourged Back' exposed the horror of slavery. Now it's embroiled in America's censorship debate*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/style/scourged-back-peter-trump-censorship; Maxine Joselow, *Park Service Is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sept. 16, 2025), https://www.nytimes.com/2025/09/16/climate/trump-park-service-slavery-photo-tribes.html.

[106] Holland, *supra* note 105.

[107] *Id.*

[108] *Id.*

[109] Jerry Mitchell, *Medgar Evers' killer was a Klansman, but Trump administration says stop calling him a racist,* Miss. Today (Feb. 5, 2026), https://mississippitoday.org/2026/02/05/medgar-evers-killer-trump-says-stop-calling-him-racist/.

[110] *Id.*

Citizens' Council."[111] De La Beckwith also belonged to the White Knights of the Ku Klux Klan in Mississippi—a notoriously violent group who crusaded against political rights for Black people.[112]

176. The removal of the brochures faced public outcry, including a letter from U.S. Representative Bennie Thompson.[113]

177. At Manassas National Battlefield Park in Virginia, Defendant NPS ordered the removal of a sign criticizing the post-Civil War "Lost Cause" ideology, which "romanticized the Confederacy and denied slavery's central role in the conflict."[114]

178. Defendant NPS also instructed its staff at the former home of Confederate General Robert E. Lee to "stop using a booklet that was designed to teach children about slavery."[115]

179. Defendants' actions, pursuant to the Executive Order and the Secretarial Order, have caused the removal of content at NPS sites that discusses America's history of racial oppression. For example, Defendant NPS removed the exhibit "History Under Construction" from the Muir Woods National Monument, which provided information about the Coast Miwok and Southern Pomo peoples and how colonial violence contributed to their displacement.[116]

---

[111] *Id.*
[112] *Id.*
[113] Jerry Mitchell, *Revision of brochures at Evers home fails to change what happened there, niece says*, Miss. Today (Feb. 5, 2026).
[114] Joselow, *supra* note 105.
[115] *Id.*
[116] Olivia Hebert, *Muir Woods exhibit becomes first casualty of White House directive to erase history*, SFGATE (July 22, 2025), https://www.sfgate.com/california-parks/article/muir-woods-national-monument-history-erased-20781301.php.

180. Defendants have also targeted federal holidays that honor Black history. In December 2025, the Trump administration removed Martin Luther King Jr. Day and Juneteenth from the few select days when visitors to the National Park System can enter sites for free.[117]

181. In its place, the administration added President Trump's birthday as a fee-free day; Defendant DOI referred to the new fee-free dates, which no longer include Martin Luther King Jr. Day and Juneteenth, as "patriotic" days.[118]

182. In 2025, President Trump commemorated Juneteenth by "complaining that there were too many non-working holidays in America."[119] In contrast, he issued proclamations commemorating Father's Day, Flag Day, and National Flag Week, and the 250th anniversary of the Battle of Bunker Hill, which are not among the eleven annual federal holidays but nevertheless advance President Trump's preferred version of United States history.[120]

183. On March 2, 2026, *The Washington Post* published an article discussing an internal government database maintained by Defendant NPS, containing submissions from park managers across the National Park System, flagging displays and materials with "partisan ideology," descriptions that "disparage" Americans, or materials that stray from a focus on the nation's "beauty, abundance, or grandeur."[121]

---

[117] Alana Wise, *National parks' fee-free calendar drops MLK Day, Juneteenth and adds Trump's birthday*, NPR (Dec. 6, 2025), https://www.npr.org/2025/12/06/g-s1-101090/national-parks-fee-free-calendar-mlk-juneteenth.

[118] *See id.*

[119] Kanno-Youngs, *supra* note 78.

[120] Erica L. Green, *How Trump Treats Black History Differently Than Other Parts of America's Past*, N.Y. Times (June 20, 2025), https://www.nytimes.com/2025/06/20/us/politics/trump-black-history-federal-holidays.html.

[121] Karin Brulliard & Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://www.washingtonpost.com/climate-environment/2026/03/02/national-parks-signs-censorship-slavery/.

184. Following the publication of *The Washington Post* article, it was reported that 82 parks, nearly half of all the 171 sites within the National Park System where displays were flagged for removal or revision, were flagged for mentioning "slavery," "racism," "the Civil War," "civil rights," "segregation," "integration," or "Black history."[122]

185. Defendants flagged content at the Selma to Montgomery National Historic Trail, which honors the route of the 1965 voting rights marches. Specifically, NPS officials acknowledged the content to be "historically accurate and supported by firsthand accounts" but also deemed it to be potentially "disparaging [to visitors] less familiar with the Civil Rights Movement."[123]

186. At Cane River Creole National Historical Park in Louisiana, a site that interprets the history of the Oakland and Magnolia plantations and the Creole people who lived on those lands for over 200 years, Defendants flagged and removed exhibits identifying enslavers and using the phrase "white privilege."[124]

187. At the Timucuan Ecological and Historic Preserve in Jacksonville, Florida, a site that interprets the history of slavery in Florida, Defendants stated that text at the site may be considered disparaging to the United States, including those describing the "horrid conditions the enslaved endured during their transport to the Americas."[125]

---

[122] Angelo Villagomez, Mariam Rashid & Kendra Hughes, *Censored: Erasing 250 Years of American History on Public Lands*, Ctr. for Am. Progress (June 30, 2026), https://www.americanprogress.org/article/censored-erasing-250-years-of-american-history-on-public-lands/.

[123] *Id.*

[124] *See id.*

[125] Madison Dapcevich, *Slavery, Civil Rights, Climate Change. The Feds Are Flagging These Topics (and Others) for Removal at National Parks*, Outside (Mar. 11, 2026), https://www.outsideonline.com/outdoor-adventure/environment/national-parks-removing-history-climate-change/.

188. In June 2026, NPS ordered the removal of three signs with six quotes addressing slavery and equality, amongst other topics, from the Bunker Hill Monument in Charlestown, Massachusetts.[126]

189. In Washington, D.C., NPS removed a sign detailing the racist legacy of former Senator Francis G. Newlands from a memorial fountain. The sign had described Newland's support of white supremacy.[127]

**PLAINTIFFS' HARMS FROM DEFENDANTS' ACTIONS AT THE PRESIDENT'S HOUSE SITE**

190. The Executive Order and Secretarial Order, which resulted in Defendants' removal of the educational and interpretive panels that are part of the PH/Slavery Memorial at the President's House site, cause ongoing injury to Plaintiffs.

**A. Avenging The Ancestors Coalition**

191. ATAC was formed in 2002 with the mission to urge the City, Defendant NPS, and Independence Park to agree to the creation of a Commemoration Project that would later become the PH/Slavery Memorial.

192. Today, ATAC has approximately 300 active members who regularly attend meetings and events and work to advance the organization's mission to recognize, use, and preserve the commemorative exhibit at the President's House site. ATAC's members include historians, teachers, community leaders, religious leaders, elected officials, and community members.

---

[126] *See* Don Seiffert, *National Park Service intends to remove selected quotes from Bunker Hill Monument*, GBH (June 7, 2026), https://www.wgbh.org/news/local/2026-06-06/national-park-service-intends-to-remove-selected-quotes-from-bunker-hill-monument.

[127] *See* Kate Plummer, *List of Times Trump Administration Has Removed Race, Slavery Plaques*, Newsweek (June 5, 2026), https://www.newsweek.com/trump-administration-bunker-hill-plaques-12036215.

193. ATAC is led by Michael Coard, who is Black, and many of the organization's members are descendants of people who were enslaved in the United States.

194. Since the opening of the PH/Slavery Memorial in 2010, ATAC has remained actively engaged with the PH/Slavery Memorial, as part of the organization's ongoing mission to ensure that the stories of the enslaved individuals who lived and labored there remain visible and relevant.

195. For example, ATAC monitored conditions at the memorial, communicating with government entities regarding maintenance and preservation issues, including problems with the memorial's digital monitors and recurring condensation affecting display components.

196. ATAC organizes events and programming at the PH/Slavery Memorial and facilitates community use of the memorial for educational and commemorative purposes. Each year, on December 15, ATAC commemorates the opening of the memorial.

197. ATAC also gathers annually at the site on several other dates of historical significance to enslaved people, in recognition of the paradox between the nation's founding ideals of liberty and freedom and the reality of slavery that the site represents. These annual gatherings include President's Day; May 21 (to mark Ona's escape in 1796); July 4 (to commemorate the role of enslaved people at the nation's founding); and August 25 (to commemorate the first arrival of enslaved Africans in 1619 to the land that later became the United States).

198. These regular events are central to ATAC's mission because they create opportunities to engage a broad range of stakeholders—including community members, students, tourists, and public officials—in confronting the site's history and its contemporary significance. In doing so, ATAC ensures the stories of the enslaved individuals are preserved, understood, and carried forward across generations.

199. Following issuance of the Executive Order and Secretarial Order, ATAC suffered organizational harm because it needed to use valuable and finite resources to assess the impact of the Executive Order and Secretarial Order, respond to community concerns, and prepare for anticipated changes to the PH/Slavery Memorial by Defendants.

200. Prior to the Executive Order, ATAC held monthly general body meetings. From March 2025 to January 2026, however; ATAC met at least twice weekly to organize and respond to the Executive Order and Secretarial Order, which threatened the removal of the PH/Slavery Memorial. These efforts directly impacted the limited resources necessary for ATAC's core programming.

201. ATAC also expended organizational resources on advocacy, including coordinating and advertising rallies in opposition to the anticipated removal or alteration of the PH/Slavery Memorial by Defendants. These rallies were central to mobilizing community members, educating the public, and organizing responses to any potential removal of the memorial.

202. Because the Executive Order and Secretarial Order created significant uncertainty regarding the continued availability and integrity of the PH/Slavery Memorial's educational and interpretive materials, ATAC's ability to plan programming, coordinate events, and encourage public engagement with the site was impaired.

203. ATAC anticipated the removal of the PH/Slavery Memorial because both the Executive Order and Secretarial Order expressly discussed the President's House site. ATAC, therefore, sent a letter to Defendant NPS and Independence Park requesting a meeting regarding the Executive Order, the PH/Slavery Memorial, and the anticipated removal. ATAC did not receive a response from Defendant NPS.

204. Defendants' removal of the interpretive panels at the PH/Slavery Memorial, pursuant to the Executive Order and Secretarial Order, continues to cause ongoing organizational and associational harm to ATAC. Defendants' implementation of the Executive Order and Secretarial Order—by removing the panels—impedes the ability of ATAC's members to access accurate and complete information about American history at the President's House site, impairing ATAC's mission and interfering with its core organizational activities.

205. ATAC's members regularly visit, use, and engage with the PH/Slavery Memorial for educational, commemorative, and advocacy purposes. Due to the absence of—or—changes to—the interpretive panels resulting from the Executive Order and Secretarial Order, the President's House site no longer reliably conveys the history that the PH/Slavery Memorial was specifically designed to present and preserve.

206. Since issuance of the Executive Order and Secretarial Order, which resulted in Defendants' removal of the exhibit, ATAC continues to expend organizational resources to explain the historical significance of the President's House to the public, including at meetings, protests, and in email communications.

207. Defendants' actions have also caused significant dignitary harms to ATAC and its members by undermining the organization's longstanding efforts to preserve, protect, and expand public recognition of the lives of the Nine Enslaved African Descendants commemorated at the President's House site.

208. The targeting of the President's House site by the Executive Order and Secretarial Order, as well as Defendants' implementation of those orders that caused the removal of the panels, diminishes the visibility and acknowledgment of the Nine Enslaved African Descendants and erases the historical narrative that ATAC works to preserve, protect, and celebrate.

209. This harm is particularly acute given the President's House's historical significance. The PH/Slavery Memorial was intentionally designed to present the nation's founding ideals of liberty and independence alongside the reality that the Nine Enslaved African Descendants were held in bondage at the President's House. Thus, the exhibit is fundamental to ATAC's core activities and mission.

210. The Executive Order and Secretarial Order caused Defendants to remove the interpretive panels, distorting that historical narrative and undermining the site's core purpose. Defendants have deprived ATAC's members of the ability to experience the memorial within the full historical context, causing cultural injury.

211. For example, as the nation approached the 250th anniversary of its founding, there was a moment of heightened public engagement with American history. ATAC relied on the original PH/Slavery Memorial to provide an accurate account of that history—one that includes the reality of enslavement at the President's House site, as well as Philadelphia's central role in shaping both the Fugitive Slave Act and the Gradual Abolition Act. ATAC planned programming, including its annual July 4 gathering, for the 250th anniversary. However, the changes to the PH/Slavery Memorial prompted ATAC to engage in grassroots advocacy to restore the site.

212. The Executive Order and Secretarial Order also undermine and impede ATAC's advocacy efforts. For example, ATAC uses the PH/Slavery Memorial project as a model for broader advocacy. Members have worked to identify other historic sites—particularly on federal land—where the history of enslaved African descendants remain unrecognized.

213. These harms are further compounded by the fact that the PH/Slavery Memorial is the result of nearly a quarter century of sustained advocacy, maintenance efforts, and collaboration among ATAC, the City, and Defendant NPS. Defendants' actions undermine and frustrate

ATAC's mission through the erasure of interpretive materials that are the result and foundation of ATAC's advocacy.

214. ATAC continues to suffer associational harm, and these harms are particularly acute for members of ATAC who are Black. For generations, African American communities have resisted the dehumanizing legacy of slavery by preserving and honoring a collective history, in recognition and in spite of the rupture that chattel slavery caused to familial and communal bonds. Defendants' actions disrupt that ongoing effort and undermine the recognition of that history at the President's House site.

215. The PH/Slavery Memorial was the only place within the National Park System that, until January 2026, fully interpreted the presence of the Nine Enslaved African Descendants held in bondage at the President's House by our nation's first president. The callous removal of this history by Defendants is degrading, distressing, and dehumanizing.

216. Defendants' actions also send a message that the history of slavery and the lives of the Black people connected to that history are unimportant and should be excised from discussions on American history within the National Park System.

217. Defendants' removal has also impaired ATAC's ability to engage in cultural and spiritual practices that honor its members' ancestors, including gatherings and commemorative activities at the site, such as the offering of libations. By eliminating core interpretive elements of the PH/Slavery Memorial, Defendants have disrupted ATAC's ability to maintain these historical and cultural connections.

218. ATAC's injuries are ongoing. Each day that the Executive Order and the Secretarial Order brand the PH/Slavery Memorial as "inappropriate," and each day that the prior interpretive panels remain absent from the PH/Slavery Memorial, ATAC is denied the ability to access

essential historical and interpretive material, impairing ATAC's ability to rely on the PH/Slavery Memorial for educational, commemorative, and advocacy purposes.

**B. The Black Journey**

219. The Black Journey is a private walking tour company dedicated to the preservation, interpretation, and public dissemination of Black history through place-based educational tours and audio experiences in Philadelphia. The Black Journey's tours center historically accurate narratives that reflect the lived experiences of Black people in America and their foundational role in the development of the United States, with a primary focus on Philadelphia's colonial history.

220. The Black Journey was founded in 2019 by Raina Yancey, a Black woman. She is the daughter of Dr. Victoria Ward Yancey, a former NPS Park Ranger who worked at the Independence Park. As a young girl, Raina Yancey often visited Independence Park, long before there were any references to the history of Black people and their connection to the President's House.

221. The Black Journey serves approximately 500 visitors annually, including students, educators, residents, and cultural tourists.

222. The Black Journey's staff includes three independent contractors, in addition to Ms. Yancey.

223. The Black Journey offers five live-guided tours, three of which include a visit to the PH/Slavery Memorial. The PH/Slavery Memorial is central to The Black Journey's tour designs given the location's national significance and the importance of the historical and archeological information available at the site.

224. As a result, The Black Journey spends a substantial amount of time at the PH/Slavery Memorial and treats the site as foundational in its tours when sharing information about Black history in Philadelphia with tourists.

225. The Black Journey's audio tour includes a dedicated stop at the PH/Slavery Memorial, extending access to this history for individuals who engage with the President's House independently or outside of scheduled tour times.

226. The audio tour was developed in reliance on the availability of full and historically accurate interpretive materials at the site.

227. The live-guided tours and audio programming related to the PH/Slavery Memorial are integral to The Black Journey's tours and advance the organization's educational mission and professional reputation. The Black Journey's audio tour materials serve to educate the public on the role of enslavement at the founding of the nation, and how people in the highest levels of American government participated in the "dirty business."

228. For example, many visitors learn on The Black Journey's tours that President George Washington held people of African descent in slavery at the President's House by subverting gradual abolition laws. Many of these tourists were previously unaware that enslaved people were forced to live and labor at the President's House.

229. A tour guide with The Black Journey was at the PH/Slavery Memorial when Defendant NPS's workers pried the memorial's interpretive panels off the walls pursuant to the Executive Order and the Secretarial Order. The interpretive panels provided educational materials, including information about the nine enslaved people that Washington brought to the President's House during his presidency, that are integral to The Black Journey's tours.

230. Defendants' implementation of the Executive Order and Secretarial Order has harmed The Black Journey's core business activities. Defendants' removal of the PH/Slavery Memorial's interpretive panels results in the erasure of important context from the site, impacting The Black Journey's tours. For example, the interpretive panels that are no longer accessible

included discussions of the slave trade in Philadelphia, the abolitionist movement, and the story of Ona Judge's escape from slavery.

231. Following Defendants' removal of the interpretive and educational panels, The Black Journey provided paid training to its tour guides to ensure that tours remained up-to-date on the history of the President's House and the PH/Slavery Memorial.

232. The Black Journey also had to devote additional time and financial resources to train tour guides on how to discuss the removal of the panels and the ongoing controversy. The Black Journey was also forced to adjust tour routes.

233. In partnership with The Ona Judge Coalition, The Black Journey created a new walking tour entitled "Ona Judge's Philadelphia: A Journey to Freedom Tour," which was developed to share Ona Judge's story and highlight the landmarks where she lived and was enslaved. This tour was created in direct response to Defendants' implementation of the Executive Order and Secretarial Order to provide tourgoers with the opportunity to visit the sites where Ona Judge lived and was held in bondage, including the President's House site, and to learn about information that is no longer available at the PH/Slavery Memorial due to the removal of the original educational and interpretive panels.

234. The Black Journey had to undertake significant financial expenses and reallocate the company's limited resources to create the "Ona Judge's Philadelphia: A Journey to Freedom Tour." To safeguard The Black Journey's mission and professional reputation, the tour had to be both comprehensive and historically accurate.

235. The Black Journey also sought to maintain the examination of the paradox between slavery and freedom that was a foundational component of the PH/Slavery Memorial's interpretive panels. The paradox had become central to The Black Journey's tours and activities. Ms. Yancey

spent over 180 hours developing an updated script, route, map, and other materials for the tour. She studied Ona Judge's life by purchasing books written about Ona Judge and conducting extensive online research. As part of her research, Ms. Yancey also took a trip to New Hampshire, where Ona Judge lived for the remainder of her life after escaping enslavement at the President's House. When the new panels mentioning Ona Judge were installed at the PH/Slavery Memorial, Ms. Yancey devoted additional time to studying how they differed from the original panels and incorporating explanations of those differences into the new tour.

236. Ms. Yancey is committed to paying people for their time and their intellectual labor, as a core part of The Black Journey's ethos. Accordingly, she paid tour guides and other contractors $25 per hour to provide feedback and help refine the tour and tour materials during its development and production.

237. As of October 2026, The Black Journey has spent over 200 hours collectively and incurred approximately $14,000 in research and other development costs, marketing, and contractor time and resources.

238. Defendants' replacement of the interpretive and educational panels that were originally part of the PH/Slavery Memorial required The Black Journey to put a brief written notice on its tour app that discusses the replacement panels. To properly address the changes, The Black Journey will have to re-record its audio tour. The Black Journey estimates that securing studio time to record the script and commissioning an audio production company to edit the new material and finalize the new audio tour will cost approximately $700.

239. The Black Journey experienced significant economic harm, including lost profits resulting from addressing changes at the President's House site, developing the new Ona Judge tour, revising materials, and preparing to re-record its audio tour.

240. The Black Journey has also had to divert or reallocate its marketing time and expenditure from other tours that do not feature the PH/Slavery Memorial to focus on the Ona Judge tour.

241. Ms. Yancey has had to turn down opportunities to expand The Black Journey's work, both in Philadelphia and outside the city, due to the decreased capacity resulting from issuance of the Executive Order and Secretarial Order, the subsequent removals of the PH/Slavery Memorial's interpretive panels, and the installation of the new exhibit at the President's House site.

242. The Black Journey is committed to ensuring that Black history is preserved, accessible, and accurately represented. Defendants' removal of the interpretive panels that are part of the PH/Slavery Memorial and their installation of new panels erase or distort documented historical truths, including the historical facts about the President's House—all of which harms The Black Journey and impairs core functions of the business.

243. The Black Journey staff regularly visit the PH/Slavery Memorial to facilitate tours for students, educators, and members of the public to the memorial, and rely on the information available at the President's House site. Defendants' actions materially undermine The Black Journey's ability to carry out its educational programming through its tours and have caused staff to expend time and resources to redesign its tours and materials.

244. Black customers who wish to learn about their history, and who seek out The Black Journey's tours in order to educate themselves, are especially harmed by the targeted removal of history about Black people at the President's House site.

245. Additionally, Ms. Yancey and The Black Journey's three Black tour guides have experienced emotional distress and dignitary injuries from the removal of and attack on the

PH/Slavery Memorial, causing further harm to The Black Journey's profitability and professional success.

246. These tour guides have observed Defendants treat historical information about Black people differently than the history of white people, as demonstrated by Defendants' removal of only the history, culture, and lived experiences of Black people from the narrative of this nation's founding and its connection to the President's House.

247. A tour guide employed by The Black Journey described the new interpretive panels as "diminishing" the role of slavery at the President House because the panels minimize the horrors of slavery. Similarly, both tour guides and Black customers of The Black Journey expressed significant distress at witnessing Defendants' removal of and reckless disregard for the interpretive and educational panels.

248. Black people are uniquely impacted by the selective removal of their history, while history involving white historical figures at the President's House site remains undisturbed. This harm is particularly acute for many Black Americans since chattel slavery stripped enslaved people of their names, separated them from their families, and prevented their descendants from fully knowing their lineage and family history.

249. The Black Journey is similarly concerned about other historical and cultural sites with information about Black people that are within Defendants' control. The Black Journey fears that the permanent removal of the original panels at the President's House and other sites perpetuates an archaic perspective that Black people and their experiences are irrelevant to the history, culture, and identity of America.

250. The Black Journey was created to combat such false and inaccurate white supremacist narratives, birthed during slavery and sustained through the Redemption period and Jim Crow.

251. The Executive Order, the Secretarial Order, and Defendants' actions implementing both orders at the President's House site harm The Black Journey's brand and business model by reinforcing these narratives at the expense of Black history and culture, which form the core of The Black Journey's business activities.

**THE SECRETARIAL ORDER IS A FINAL AGENCY ACTION**

252. The circumstances preceding the issuance of the Secretarial Order show that it represents the consummation of the Department of the Interior's decision-making process. The Executive Order explicitly directed the Secretary of the Interior to "take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times)."[128] Approximately a month and a half after the Executive Order was issued, the Secretary implemented the Executive Order's directive by issuing the Secretarial Order. The Secretarial Order tracks the Executive Order, even quoting some of its language and reiterating its instructions, thus reflecting the Secretary's desire to directly realize and effectuate the directives of the Executive Order.

253. The plain language of the Secretarial order clearly indicates its intent to be final and binding. Section 5(b) of the Secretarial Order states that, within ninety days of the Secretarial Order, "each land management Bureau *shall* conduct a review of all public monuments,

---

[128] Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. at 14564.

memorials, statues, markers, or similar properties on lands within its jurisdiction" in order to determine whether any "inappropriately disparage[] Americans past or living" or, "with respect to content describing natural features, [] emphasize[] matters unrelated to the beauty, abundance, or grandeur of said natural feature."[129] The Secretarial Order then states that, within 120 days of the Secretarial Order, "each land management Bureau *shall* remove any content meeting the [enumerated] criteria … [and] *shall* then take action to replace the removed content[.]"[130] The Secretarial Order's use of the word "shall" demonstrates its intent to impose a mandatory and nondiscretionary duty on the land management Bureaus.

254. The actions taken by NPS following the Secretarial Order show NPS viewed the Secretarial Order as having the status of law. Upon information and belief, after the issuance of the Secretarial Order, NPS immediately began a review of all relevant property within its jurisdiction to assess compliance with the guidelines laid out by the Secretarial Order. NPS internally "flagged hundreds of exhibits, panels and other physical installations" that it believed fell afoul of those guidelines.[131] Then, as called for by Section 5(b)(2) of the Secretarial Order, on January 22, 2026, NPS promptly removed the educational and interpretive panels from the PH/Slavery Memorial and disabled all five motion-activated video screens. Several months later, it installed replacement panels at the PH/Slavery Memorial that de-emphasize the history of slavery at the site.

---

[129] Restoring Truth and Sanity to American History, Secretarial Order No. 3431 § 5(b)(1) (emphasis added).

[130] *Id.* § 5(b)(2) (emphasis added).

[131] Heather Richards, *The Trump administration cracks down on national park websites*, E&E News by POLITICO (May 1, 2026), https://www.eenews.net/articles/the-trump-administration-cracks-down-on-national-park-websites/.

255. At no point did NPS stray from the mandates of the Secretarial Order or otherwise act in any way indicating it did not perceive the Secretarial Order to be a final agency action that is binding on NPS.

## CLAIMS FOR RELIEF
## COUNT ONE
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Not in Accordance with Law
### National Park Service Centennial Act, 54 U.S.C. § 100801 et seq.
***All Plaintiffs Against All Defendants***

256. Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

257. Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

258. Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

259. The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

260. The Secretarial Order is an "order" because it is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6).

261. The Secretarial Order constitutes final agency action subject to judicial review. The Secretarial Order marks the "consummation" of the agency's decision-making process and is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

262. The Secretarial Order violates the Centennial Act because it is in direct conflict with Congress' mandate to "ensure that management of System units and related areas is enhanced

by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.

263. Congress explained what is considered the highest quality interpretation and education in § 100803: programs that

> (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis.

54 U.S.C. § 100803.

264. Defendants did not consider the Centennial Act when issuing and implementing the Secretarial Order. This is in direct conflict with Congress' mandate under the Centennial Act to "promot[e] and protect[] the natural, historic, and cultural resources of our National Parks for the enjoyment of present and future generations, and for other purposes." Pub. L. No. 114-289, 130 Stat. 1482 (2016).

265. Moreover, the Secretarial Order does not "provid[e] opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System," 54 U.S.C. § 100801(1)(A).

266. Nor does it "enhance[] public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." 54 U.S.C. § 100801(2). In fact, the Secretarial Order and its implementation do the opposite by depriving visitors of learner-centered materials and undermining the learning objective of the site due to the removal of critical information from the President's House.

267. The Secretarial Order is "not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(A).

**COUNT TWO**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious, Abuse of Discretion, Not in Accordance with Law**
**National Park Service Organic Act, 54 U.S.C. § 100101 et seq.**
***All Plaintiffs Against All Defendants***

268. Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

269. Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

270. Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

271. The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

272. The Secretarial Order is an "order" because it is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6).

273. The Secretarial Order constitutes final agency action subject to judicial review. The Secretarial Order marks the "consummation" of the agency's decision-making process and is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 ((internal quotation marks omitted).

274. The duty of a court reviewing agency action under the "arbitrary and capricious" standard is to ascertain whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and

the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

275. Agency action will be set aside

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43.

276. Defendant Burgum's Secretarial Order is in direct conflict with Congress' mandate to Defendant NPS, under the Organic Act, to "leave [the National Park System] unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

277. Defendant NPS's Management Policies interpret the Organic Act.

278. The Secretarial Order requires the review and removal of content from properties within the National Park System for "inappropriate content" and specifically calls for removal of any content "otherwise found to be inconsistent with the purposes of EO 14253."

279. The Secretarial Order does not contemplate whether the review and removal of content from properties within the National Park System for "inappropriate content" is an "impairment" that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." *Management Policies* § 1.4.5.

280. The Secretarial Order does not contemplate whether the review and removal of content from properties within the National Park System for "inappropriate content" would affect a resource or value whose conservation is

> necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or key to the natural or

> cultural integrity of the park or to opportunities for enjoyment of the park, or identified in the park's general management plan or other relevant NPS planning documents as being of significance.

*Management Policies* § 1.4.5.

281. The Secretarial Order does not require an NPS decision-maker to consider the impacts of the review and removal of content from properties within the National Park System for "inappropriate content" and determine, in writing, that the activity will not lead to an impairment of park resources and values. *Management Policies* § 1.4.7.

282. The Secretarial Order directly contravenes Congress' mandate that Defendant NPS's

> authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress.

54 U.S.C. § 100101(b)(2).

283. Defendants failed to collect "advice or insights offered by subject matter experts and others who have relevant knowledge or experience" and consider "the results of civic engagement and public involvement activities relating to" whether the Secretarial Order could lead to an impairment.

284. The Secretarial Order is "arbitrary" and "capricious," within the meaning of 5 U.S.C. § 706(2)(A), because Defendants failed entirely to "engage in 'reasoned decisionmaking.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). Defendants' actions were executed without a reasoned explanation, relied on factors that Congress did not authorize it to consider, failed to consider

important aspects mandated by Congress, and disregarded material facts and longstanding reliance interests.

285. The Secretarial Order is also an "abuse of discretion," within the meaning of 5 U.S.C. § 706(2)(A), because the management discretion that Congress granted to Defendants is limited by the statutory requirement that Defendants ensure park resources and values remain unimpaired. Here, Defendants failed, entirely, to consider any impacts of their actions, let alone avoid impairments.

286. The Secretarial Order is "not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(A).

287. Defendants' actions were not taken for "the protection, management, and administration of the System units," were not "conducted in light of the high public value and integrity of the System," and were "exercised in derogation of the values and purposes for which the System units have been established." *See generally* 54 U.S.C. § 100101(b)(2).

## COUNT THREE
**Violation of the Fifth Amendment**
**Equal Protection Component of the Due Process Clause**
***All Plaintiffs Against All Defendants***

288. Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

289. The Fifth Amendment's Due Process Clause prohibits the federal government from "engaging in discrimination that is so unjustifiable as to be violative of due process," which is construed to contain an equal protection component. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 (3d Cir. 2001) (internal quotation marks omitted).

290. Equal protection of the laws is violated by authorities' selective enforcement of "a facially neutral law or policy" so that it is "applied differently on the basis of race." *Doe ex rel.*

*Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

291. In order to prevail on a selective enforcement claim, Plaintiffs must show: (1) they were "treated differently from another, similarly situated [group], and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right.'" *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (quoting *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010)).

292. Plaintiffs may also show that a law or policy violates the Constitution's equal protection guarantees because "is motivated by discriminatory intent and has a racially discriminatory impact." *Antonelli*, 419 F.3d at 274 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ("*Arlington Heights*")).

293. The Equal Protection violation need not rest "solely on . . . discriminatory purposes" or even have a discriminatory purpose that is the decisionmaker's "dominant" or "primary" motive. *Arlington Heights*, 429 U.S. at 265. Indeed, if a discriminatory purpose is, at least in part, a motivating factor in the decision, judicial deference is no longer justified. *Id.* at 265–66.

294. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

295. The task of assessing a state actor's motivation includes analysis of several non-exhaustive factors, among them: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events

leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) administrative history, including "contemporary statements by members of the decisionmaking body." *Id.* at 266–68.

296. Discriminatory statements by the President that are close in time and relevant to the context of executive officials' actions at issue may "raise a plausible inference" of unconstitutional motivations. *Regents of the Univ. of Cal.*, 591 U.S. at 35 (citing *Arlington Heights*, 429 U.S. at 268).

297. Section 4(a)(iii) of the Executive Order and the Secretarial Order were promulgated and/or implemented by Defendants, at least in part, with the purpose of discriminating against Black people.

298. Both the Executive Order and the Secretarial Order were created to censor, erase, and exclude Black people and the history of Black people in this country from interpretations of American history, American identity, American culture, and America's founding at sites within the National Park Service.

299. Moreover, Defendants' decision to install a new exhibit at the President's House site and remove critical components of the PH/Slavery Memorial that discussed the existence and relevance of the Nine Enslaved African Descendants held in bondage at the President's House has the desired effect of diminishing Black people and their history from public narratives of American history, identity, and culture, so as not to "disparage" white people.

300. The history of the Executive Order, Secretarial Order, Defendants' removal of several components of the PH/Slavery Memorial, and installation of a new exhibit; the sequence of events leading up to them; and the contemporaneous statements and actions of President Trump and officials in his administration raise a strong inference of a discriminatory purpose.

301. The known and reasonably foreseeable discriminatory impact/effect of the Executive Order, Secretarial Order, and Defendants' decision to install a new exhibit at the President's House site and remove components of the PH/Slavery Memorial regarding Black people, among other factors, raise a strong inference of a discriminatory purpose. *See, e.g.*, *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 563 (3d Cir. 2002) ("[T]he 'impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.'" (quoting *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997)).

302. The Executive Order, the Secretarial Order, and Defendants' installation of a new exhibit and ultimate removal of the components of the PH/Slavery Memorial "bear more heavily" on Black people, *see Arlington Heights*, 429 U.S. at 269, because museums, historical sites, exhibits, photos, websites, and other displays that showcase slavery or the history and lived experiences of Black people are specifically singled out and flagged for review, alteration, or exclusion because they are purportedly "disparaging" or "corrosive" to the American identity. An internal government database demonstrates that the vast majority of information and materials flagged by Defendants for revision or removal, in compliance with the Executive Order and Secretarial Order, discusses slavery and Black people in the United States.[132] Accordingly, the implementation of the Executive Order and Secretarial Order were "applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances" in violation of equal protection. *Yick Wo*, 118 U.S. at 373–74.

---

[132] *See also* Brulliard & Dennis, *supra* note 121.

303. In addition to the other harms experienced by Plaintiffs, both the Executive Order and the Secretarial Order target information and depictions of slavery and other forms of racial oppression that are uniquely related to Black people while preserving contemporaneous displays about white people, including enslavers. Thus, the removal of information and depictions that uniquely pertain to Black people—for purportedly being "disparaging" or "corrosive"—creates a stigma about Black people that is experienced disproportionately, if not exclusively, by Black people.

304. Although inaccurate and incomplete accounts of American history, resulting from the suppression of information about Black people, impact people of all races visiting the PH/Slavery Memorial . . . seemingly "in an identical manner", "the reality is . . . the . . . impact [of the removal] falls on the minority" because the history of white people has not been erased or excluded or placed at risk of erasure or exclusion. *Hunter v. Erickson*, 393 U.S. 385, 391 (1969).

305. The exclusion of Black people from the narrative of America's history and heritage is contrary to NPS's own recognition of the need for inclusion to "share an accurate and comprehensive history," given that "[h]istory has typically been presented from the perspective of the dominant group in power and can, intentionally or not, exclude details that tell a more holistic story."[133]

306. This is particularly acute with respect to the PH/Slavery Memorial, due to the dearth of public spaces in the United States that actively inform and educate the general public about the role of chattel slavery at the founding of the United States, including the lives of the Nine Enslaved

---

[133] *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://perma.cc/AQ5V-37E4 (captured Feb. 16, 2026); *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://perma.cc/82JZ-VK7M (captured Feb. 16, 2026).

African Descendants held in bondage by the first president of the United States, George Washington.

**<u>COUNT FOUR</u>**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right**
***All Plaintiffs Against All Defendants***

307. Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

308. Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

309. Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

310. The APA authorizes this Court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

311. The Secretarial Order is an "order" because it is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6).

312. The Secretarial Order constitutes final agency action subject to judicial review. The Secretarial Order marks the "consummation" of the agency's decision-making process and is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 ((internal quotation marks omitted).

313. The Fifth Amendment's Due Process Clause "contains an equal protection component" that prohibits the federal government from invidiously discriminating between individuals or groups. *Washington v. Davis*, 426 U.S. 229, 239 (1976).

314. Equal protection of the laws is violated by both (1) "a facially neutral law or policy [that] is applied differently on the basis of race" and (2) "a facially neutral law or policy that is

applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact." *Doe*, 665 F.3d at 543 (quoting *Antonelli*, 419 F.3d at 274).

315. The Secretarial Order and its mandate to "remove any content" that "inappropriately disparages Americans past or living (including persons living in colonial times)" were enforced selectively to erase depictions of slavery and other forms of racial oppression that are uniquely related to Black people, including at the PH/Slavery Memorial.

316. This enforcement occurred amid a stark pattern, where the vast majority of signs, exhibits, and other materials flagged for potential review and removal by Defendants pursuant to the Executive Order and the Secretarial Order discuss slavery.

317. There is a strong inference that the Secretarial Order and Defendants' decision to install a new exhibit at the President's House site and remove components of the PH/Slavery Memorial were motivated, at least in part, by discriminatory intent due to the pattern of discriminatory effect involving materials that uniquely concern Black people, contemporary statements by Defendants that evince an intent to erase and censor truthful representations of Black history, and departures from the procedures required by law under the Centennial and Organic Acts, among other evidence raise.

318. In either case, the Secretarial Order and Defendants' resulting decision to remove the PH/Slavery Memorial contravene Plaintiffs' right to Equal Protection of the laws under the Fifth Amendment to the U.S. Constitution, constituting an act "contrary to constitutional right" that violates the APA. 5 U.S.C. § 706(2)(B).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1. Declare that the Secretarial Order is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2);

2. Declare that Defendants' Secretarial Order and the Executive Order violate the Fifth Amendment to the United States Constitution;

3. Set aside or otherwise vacate the Secretarial Order as unlawful under the APA;

4. Vacate and set aside any and all orders, directives, instructions, and/or determinations by Defendants and/or their agents, employees, representatives, successors, or any other person acting directly or indirectly in concert with them that permitted and/or required the removal of the educational and interpretive panels and disabling of five motion-activated monitors that are part of the PH/Slavery Memorial;

5. Order Defendants to return the PH/Slavery Memorial to its original condition, including, without limitation, repairing any damage resulting from its removal;

6. Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from enforcing and/or implementing the Secretarial Order and Executive Order;

7. Award Plaintiffs' cost of suit and reasonable attorneys' fees and expenses, pursuant to any applicable law; and

8. Order such other relief as this Court deems equitable, just, and proper.

Dated: November 23, 2026

Respectfully submitted,

/s/ *Cara McClellan*
Cara McClellan
Attorney ID: 331129
Mary Catherine Roper
Attorney ID: 71107
Claire E. Ochroch
*Certified Legal Intern*
Ali T. Smith
*Certified Legal Intern*
PENN LEGAL ASSISTANCE OFFICE
3501 Sansom Street
Philadelphia, PA 19104
(215) 746-2164
caralm@law.upenn.edu

*Counsel for Plaintiffs Avenging the Ancestors Coalition and The Black Journey: African American Walking Tour of Philadelphia*

Avatara A. Smith-Carrington*
Kacey Mordecai*
Victor Olofin*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
acarrington@naacpldf.org
kmordecai@naacpldf.org
volofin@naacpldf.org

Alexandra S. Thompson*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
athompson@naacpldf.org

April N. Williams*
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
april.williams@wilmerhale.com

Ryan Chabot*
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ryan.chabot@wilmerhale.com

*Counsel for Plaintiff The Black Journey: African American Walking Tour of Philadelphia*

**Pro hac vice application forthcoming*